LOUISETTE G. LAGASSEY, EXECUTRIX
(ESTATE OF WILFRED J. LAGASSEY)
*v.* STATE OF CONNECTICUT
(SC 16986)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued December 1, 2003—officially released May 4, 2004

*Gary J. Strickland,* with whom was *Vincent M. DeAngelo,* for the appellant (plaintiff).

*Albert G. Danker, Jr.,* for the appellee (defendant).

*Opinion*

BORDEN, J. The plaintiff appeals[1] from the judgment of the trial court granting the defendant's motion to

[1] The plaintiff appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

dismiss. The plaintiff claims that the trial court improperly concluded that her claim against the state, alleging medical malpractice in connection with her husband's death, had been untimely presented under General Statutes § 4-148.[2] We agree and, accordingly, we reverse the judgment of the trial court.

The plaintiff, Louisette G. Lagassey, the executrix of the estate of the decedent, Wilfred J. Lagassey, presented notices of claim, individually and on behalf of the decedent's estate, to the claims commissioner (commissioner), pursuant to General Statutes § 4-141 et seq., alleging medical malpractice by one or more employees of the defendant, the state of Connecticut. The defendant moved to dismiss the claims as untimely and the commissioner granted the motion to dismiss.

Thereafter, pursuant to § 4-148 (b); see footnote 2 of this opinion; the General Assembly passed No. 96-16 of the 1996 Special Acts,[3] which authorized the decedent's

[2] General Statutes § 4-148 provides: "(a) Except as provided in subsection (b) of this section, no claim shall be presented under this chapter but within one year after it accrues. Claims for injury to person or damage to property shall be deemed to accrue on the date when the damage or injury is sustained or discovered or in the exercise of reasonable care should have been discovered, provided no claim shall be presented more than three years from the date of the act or event complained of.

"(b) The General Assembly may, by special act, authorize a person to present a claim to the Claims Commissioner after the time limitations set forth in subsection (a) of this section have expired if it deems such authorization to be just and equitable and makes an express finding that such authorization is supported by compelling equitable circumstances and would serve a public purpose. Such finding shall not be subject to review by the Superior Court.

"(c) No claim cognizable by the Claims Commissioner shall be presented against the state except under the provisions of this chapter. Except as provided in section 4-156, no claim once considered by the Claims Commissioner, by the General Assembly or in a judicial proceeding shall again be presented against the state in any manner."

[3] Special Acts 1996, No. 96-16, § 1, provides in relevant part: "Notwithstanding the failure to file a proper notice of a claim against the state . . . within the time limitations specified by subsection (a) of section 4-148 of the general statutes, the estate of Wilfred Lagassey is authorized . . . to present its claim against the state to the Claims Commissioner, provided the General

estate to present its claim against the defendant. The plaintiff again presented notices of claim, individually and on behalf of the decedent's estate, to the commissioner. The defendant again moved to dismiss the claims, this time on the ground that Special Act 96-16 was unconstitutional as an exclusive public emolument in violation of article first, § 1, of the constitution of Connecticut.[4] The commissioner granted the motion to dismiss the claim presented by the plaintiff individually, but denied the motion to dismiss the claim on behalf of the estate. Accordingly, the commissioner authorized the plaintiff to bring an action on behalf of the decedent's estate against the defendant.

Thereafter, the plaintiff commenced this action in the trial court. The defendant again moved to dismiss the action on the ground that Special Act 96-16 was unconstitutional as an exclusive public emolument. The trial court agreed, and dismissed the action.

The following facts and procedural history are undisputed for the purposes of this appeal.[5] In 1989, the decedent was diagnosed with an infra-renal abdominal aortic aneurysm, which measured 4.1 centimeters. After this diagnosis, the decedent was monitored regularly by a physician at Yale-New Haven Hospital. In August, 1992, an ultrasound revealed that the aneurysm had grown to approximately 5.1 centimeters. Surgery was

Assembly deems such authorization to be just and equitable and makes an express finding that such authorization is supported by compelling equitable circumstances and would serve a public purpose."

[4] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[5] "As we must in reviewing a motion to dismiss, we take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Miller* v. *Egan*, 265 Conn. 301, 305, 828 A.2d 549 (2003).

recommended and scheduled to be performed in November, 1992, by Richard Gussberg, a vascular surgeon at Yale-New Haven Hospital.

On the evening of October 7, 1992, the decedent experienced lower back pain, gastrointestinal distress, and abdominal pain. On October 8, 1992, at approximately 1 a.m., the decedent arrived at the John Dempsey Hospital at the University of Connecticut Health Center (John Dempsey Hospital), where tests were performed in order to determine the condition of the decedent's aneurysm. These tests determined that the aneurysm had grown to 5.7 centimeters, and that a leak could not be ruled out.

At that time, Steven Ruby, a vascular surgeon employed at the John Dempsey Hospital, examined the decedent. Ruby was informed that, since August, the decedent's aneurysm had grown from 5.1 to 5.7 centimeters. The decedent was given Percocet to relieve his back and abdominal pain.

Shortly thereafter, at approximately 7:45 p.m. on October 8, 1992, the decedent experienced extreme pain in his back and abdomen. Personnel at the John Dempsey Hospital then observed that the decedent's abdomen was protruding. At approximately 8 p.m., a suppository was prescribed to the decedent. Almost immediately upon administering the suppository, however, the decedent had a seizure and went into cardiac arrest. The decedent was then transferred to the operating room, where he died at approximately 9:30 p.m. The cause of death was a ruptured abdominal aortic aneurysm.

In December, 1992, the plaintiff's son, Paul Lagassey, began to inquire as to whether the decedent's death may have been caused by medical malpractice. That month, he sought the opinion of his family's physician, Hugh Friend, an internist. Friend indicated that he had

not noticed any evidence of malpractice in connection with the decedent's treatment. In early 1993, Paul Lagassey sought the opinion of Gussberg, the physician at Yale-New Haven Hospital who was scheduled to perform the surgery on the decedent in November, 1992. Upon review of the decedent's medical records, Gussberg indicated that the decedent had received the appropriate care. The matter then rested temporarily.

During the spring or summer of 1994, Paul Lagassey fortuitously met a cardiovascular surgeon, who, in conversation, stated that abdominal pain, coupled with a known abdominal aneurysm, required immediate medical attention in order to rule out a rupture. Thereafter, Paul Lagassey was referred to Stephen L. Deckoff, a vascular surgeon, who reviewed the decedent's records. On August 18, 1994, Deckoff issued a report substantiating that, in view of the decedent's symptoms and recent medical history, the appropriate standard of care required that the decedent should have received immediate medical attention in order to rule out a rupture.

On September 19, 1994, pursuant to § 4-141 et seq., the plaintiff presented a notice of claim on behalf of the decedent's estate to the commissioner against the defendant, alleging that one or more employees of John Dempsey Hospital had been negligent in their treatment of the decedent. On October 5, 1994, the plaintiff presented a second notice of claim individually, alleging the same.[6] The defendant moved to dismiss the plaintiff's claims as untimely, in accordance with the one year limitation period set forth in § 4-148 (a). The commissioner dismissed the claims as untimely, concluding that "if reasonable care had been exercised, the [plain-

---

[6] Also on October 5, 1994, the plaintiff commenced an action in the trial court alleging the same. That action was dismissed on the ground that the plaintiff had failed to receive authorization from the commissioner to bring an action against the defendant.

tiff], should have discovered the damage or injury alleged during the one year limitation period."

Thereafter, upon the plaintiff's request, and pursuant to § 4-148 (b), the General Assembly passed Special Act 96-16; see footnote 3 of this opinion; which authorized the decedent's estate to present its claim against the defendant, despite the failure to comply with the one year time limitation set forth in § 4-148 (a). Accordingly, on June 25, 1996, the plaintiff presented notices of claim, individually and on behalf of the decedent's estate, to the commissioner. The defendant moved to dismiss the claims on the ground that Special Act 96-16 was unconstitutional as an exclusive public emolument in violation of article first, § 1, of the constitution of Connecticut. See footnote 4 of this opinion. The commissioner dismissed the claim presented by the plaintiff individually on the ground that Special Act 96-16 authorized only a claim by the decedent's estate. The commissioner denied the defendant's motion to dismiss the claim on behalf of the estate, however, on the ground that the commissioner lacked the authority to review the actions of the General Assembly. Accordingly, the commissioner authorized the plaintiff to bring an action on behalf of the decedent's estate against the defendant.

Thereafter, the plaintiff commenced this action, accompanied by a certificate of good faith pursuant to General Statutes § 4-160 (b).[7] The plaintiff's complaint, alleging that the defendant was negligent in its treatment of the decedent, was set forth in two counts: count

[7] General Statutes § 4-160 (b) provides: "In any claim alleging malpractice against the state, a state hospital or a sanitorium or against a physician, surgeon, dentist, podiatrist, chiropractor or other licensed health care provider employed by the state, the attorney or party filing the claim may submit a certificate of good faith to the Claims Commissioner in accordance with section 52-190a. If such a certificate is submitted, the Claims Commissioner shall authorize suit against the state on such claim."

one on behalf of the decedent's estate; and count two on behalf of the plaintiff, individually, for loss of consortium. The defendant again moved to dismiss both counts of the complaint on the ground that sovereign immunity had not been effectively waived because Special Act 96-16 was unconstitutional as an exclusive public emolument. In addition, the defendant moved to dismiss count two of the complaint on the ground that Special Act 96-16 had not authorized the plaintiff to bring a claim individually against the defendant, but only on behalf of the decedent's estate. In opposition to the defendant's motion, the plaintiff claimed that: (1) the commissioner improperly had determined that her action was barred by the one year time limitation set forth in § 4-148 (a); and (2) therefore, Special Act 96-16 had not granted her any special privilege.[8]

The trial court concluded that the plaintiff's claim was untimely pursuant to § 4-148 (a). In addition, the court concluded that Special Act 96-16 was unconstitutional as an exclusive public emolument because there was no public purpose in allowing the plaintiff to bring an action that otherwise would have been time barred. Accordingly, the trial court granted the defendant's motion to dismiss, and rendered judgment dismissing the action.[9] This appeal followed.

[8] The trial court, *Fineberg, J.*, originally heard the defendant's motion. On December 10, 2001, that court granted the defendant's motion citing two cases: *Merly* v. *State*, 211 Conn. 199, 205, 558 A.2d 977 (1989), and *Chotkowski* v. *State*, 240 Conn. 246, 260 n.18, 690 A.2d 368 (1997). Thereafter, the plaintiff filed various motions to the court, including a motion for articulation and a motion to open and reconsider the judgment. Before those motions could be acted upon, however, Judge Fineberg passed away. Given the circumstances, the trial court, *Beach, J.*, ordered the parties to reargue the motion to dismiss on it merits. It is the subsequent judgment of the trial court, *Beach, J.*, from which the plaintiff appeals.

[9] The trial court did not address the defendant's additional claim that Special Act 96-16 did not authorize the plaintiff to bring an action individually against the defendant. Based on the following discussion, wherein we conclude that the plaintiff's claim was not untimely as a matter of law, the import of Special Act 96-16 becomes irrelevant. See footnote 21 of this opinion.

The plaintiff claims that the trial court improperly concluded that Special Act 96-16 was unconstitutional as an exclusive public emolument because the commissioner improperly dismissed her claim for untimeliness. The plaintiff's argument rests on the notion that her claim could not properly be dismissed as untimely because a trier of fact reasonably could have concluded otherwise. More specifically, the plaintiff contends that: (1) the one year limitation in § 4-148 (a) did not accrue until the plaintiff, in the exercise of reasonable care, should have discovered the injury; (2) the plaintiff, despite exercising reasonable care, did not discover the injury until the summer of 1994; and (3) because the plaintiff presented notices of claim in September, 1994, her claims were timely presented under § 4-148 (a). Therefore, relying on *Merly* v. *State*, 211 Conn. 199, 205, 558 A.2d 977 (1989), the plaintiff contends that, because Special Act 96-16 merely allowed her to bring an action that should not have been dismissed at the administrative level by the commissioner, the special act cannot be said to be unconstitutional as an exclusive public emolument, and the trial court's conclusion to the contrary was improper. We agree.

We conclude that, on the basis of our holdings in *Taylor* v. *Winsted Memorial Hospital*, 262 Conn. 797, 805, 817 A.2d 619 (2003) (plaintiff has no duty to investigate potential malpractice claim), and *Catz* v. *Rubenstein*, 201 Conn. 39, 44, 49, 513 A.2d 98 (1986) (limitation period accrues on date plaintiff discovers or should have discovered "causal nexus" between alleged negligence and subsequent injury), the trial court improperly concluded that the plaintiff's claim was untimely as a matter of law. Accordingly, pursuant to *Merly* v. *State*, supra, 211 Conn. 205, the plaintiff's claim may go forward irrespective of the constitutionality of Special Act 96-16.

We begin by setting forth the legal principles that govern actions brought against the state under chapter 53 of the General Statutes. "We have long recognized the common-law principle that the state cannot be sued without its consent. *Horton* v. *Meskill*, 172 Conn. 615, 623, 376 A.2d 359 (1977) . . . . We have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state. . . . Therefore, we have dealt with such suits as if they were solely against the state and have referred to the state as the defendant. . . . *Fetterman* v. *University of Connecticut*, 192 Conn. 539, 550–51, 473 A.2d 1176 (1984)." (Citations omitted; internal quotation marks omitted.) *Krozser* v. *New Haven*, 212 Conn. 415, 420, 562 A.2d 1080 (1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 757, 107 L. Ed. 2d 774 (1990); see also *Miller* v. *Egan*, 265 Conn. 301, 313, 828 A.2d 549 (2003).

Although the doctrine of sovereign immunity has been modified by statute and precedent, we have declined to permit monetary awards against the state or its officials in the absence of a statute granting such authority. *Krozser* v. *New Haven*, supra, 212 Conn. 420–21. "When sovereign immunity has not been waived, the . . . commissioner is authorized by statute to hear monetary claims against the state and determine whether the claimant has a cognizable claim. See General Statutes §§ 4-141 through 4-165b. The . . . commissioner, if he deems it 'just and equitable,' may sanction suit against the state on any claim 'which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable.' General Statutes § 4-160 (a)." *Krozser* v. *New Haven*, supra, 421.

Pursuant to § 4-148 (a), a claim presented under chapter 53 must be presented within one year after it accrues.

See footnote 2 of this opinion. In this regard, claims for personal injury are considered "to accrue on the date when the damage or injury is sustained or discovered or in the exercise of reasonable care should have been discovered, provided no claim shall be presented more than three years from the date of the act or event complained of." General Statutes § 4-148 (a).

Notwithstanding a claimant's failure to comply with the limitation period set forth in subsection (a), § 4-148 (b); see footnote 2 of this opinion; allows the General Assembly to pass a special act authorizing an untimely claim if it finds "compelling equitable circumstances" and "public purpose." Although § 4-148 (b) provides that "[s]uch finding shall not be subject to review by the Superior Court," special acts passed in this manner are subject to review nonetheless under the public emoluments clause contained in article first, § 1, of the state constitution. *Chotkowski* v. *State*, 240 Conn. 246, 259, 690 A.2d 368 (1997); see footnote 4 of this opinion for the text of article first, § 1, of the Connecticut constitution.

In determining whether a special act serves a public purpose, a court must uphold it "unless there is no reasonable ground upon which it can be sustained. . . . Thus, if there be the least possibility that making the gift will be promotive in any degree of the public welfare . . . we are bound to uphold it against a constitutional challenge predicated on article first, § 1." (Citations omitted; internal quotation marks omitted.) *Chotkowski* v. *State*, supra, 240 Conn. 259.

In this regard, although a special act passed under § 4-148 (b) will undoubtedly confer a direct benefit upon a particular claimant, we have found a public purpose "if it remedies an injustice done to that individual for which the state itself bears responsibility. . . . In such circumstances, the benefit conferred upon a private

party by the legislature may be viewed as incidental to the overarching public interest that is served in remedying an injustice caused by the state." (Citations omitted.) Id., 260.

"By contrast, we have consistently held that legislation seeking to remedy a procedural default for which the state is not responsible does not serve a public purpose and, accordingly, runs afoul of article first, § 1, of the state constitution. See, e.g., *Merly* v. *State*, supra, 211 Conn. 214 . . . . Thus, legislation cannot survive a constitutional challenge under article first, § 1, if it excuses a party's failure to comply with a statutory notice requirement simply because the noncompliance precludes consideration of the merits of the party's claim." (Citations omitted.) *Chotkowski* v. *State*, supra, 240 Conn. 260 n.18. Similarly, "where a special act has allowed a person named therein to bring a suit based upon a statutory cause of action that would otherwise be barred for failure to comply with a time limit specified in the statute, we have ordinarily been unable to discern any public purpose sufficient to sustain the enactment." *Merly* v. *State*, supra, 213.

*Merly* provides an apt procedural analogue for the present case. In *Merly*, the plaintiff presented a wrongful death claim on behalf of the decedent's estate, alleging that state hospital personnel were responsible for the decedent's death. Id., 202. After the commissioner dismissed the plaintiff's claim as untimely under § 4-148 (a), the General Assembly passed No. 84-21, § 1, of the 1984 Special Acts, which authorized the plaintiff's action despite the commissioner's finding of untimeliness. Id., 202–203. Thereafter, the trial court granted the defendant's motion for summary judgment on the ground that Special Act 84-21 was unconstitutional as an exclusive public emolument. Id., 201.

On appeal to this court, the plaintiff in *Merly* argued that summary judgment was improper because there

had been genuine issues of material fact regarding whether the claim had been barred by § 4-148 (a). Id., 204. The defendant argued, to the contrary, that it was not necessary for this court to review whether the commissioner had properly dismissed the claim; rather, the defendant maintained that the sole issue was the constitutionality of the special act. Id., 204–205. In determining whether we could review the commissioner's conclusion that the plaintiff's claim was untimely, we stated: "Because the principal issue presented in this case is whether the special act on which the plaintiff relies should be declared invalid as an exclusive emolument or privilege, however, we must explore whether there is any conceivable justification for this challenged legislation from the public viewpoint. *Hillier* v. *East Hartford*, 167 Conn. 100, 107–109, 355 A.2d 1 (1974); *Tough* v. *Ives*, 162 Conn. 274, 294, 294 A.2d 67 (1972); *Sanger* v. *Bridgeport*, 124 Conn. 183, 189, 198 A. 746 (1938). If the initial determination of the commissioner concerning noncompliance with § 4-148 (a) was mistaken, even though the legislature apparently reached the same conclusion, it could not be said that the plaintiff had been given any special privilege in being allowed to pursue a claim that had in fact been presented within the time allowed. Accordingly, we must address the issues that the plaintiff has raised concerning the applicability of § 4-148 (a) as a bar to his claim."[10] *Merly* v. *State*, supra, 211 Conn. 205.

Therefore, as the trial court correctly determined in the present case, the plaintiff will prevail if she can demonstrate that "the initial determination of the commissioner concerning noncompliance with § 4-148 (a)

---

[10] In affirming the trial court's judgment, the court in *Merly* v. *State*, supra, 211 Conn. 208, first agreed with the trial court that the plaintiff's claim was untimely as a matter of law. Next, the court was unable to discern any public purpose in the special act because the delay in presenting the claim was not caused by the state, and the act benefited only the estate of the decedent. Id., 214–15.

was mistaken . . . [because if that is the case], it could not be said that the plaintiff had been given any special privilege"; id., 205; and thus Special Act 96-16 would not run afoul of article first, § 1, of the state constitution. In order for the defendant to prevail, however, not only must we agree with the commissioner and the trial court that the plaintiff's claim was untimely as a matter of law, but we must also be unable to "discern any conceivable justification for [the] challenged legislation from the public viewpoint . . . ." (Internal quotation marks omitted.) *Chotkowski* v. *State*, supra, 240 Conn. 259. Put another way, in order for the plaintiff to prevail, it is sufficient to show that her claim was not untimely as a matter of law; in order for the defendant to prevail, we must determine that Special Act 96-16 furthers no public purpose, which, pursuant to *Merly*, necessarily is predicated upon a determination that the plaintiff's claim was untimely as a matter of law.

With those principles in mind, we turn to the standard that governs our review of the present case. In the trial court, the defendant moved to dismiss the action on the ground that Special Act 96-16 was unconstitutional and, therefore, the defendant had not effectively waived sovereign immunity. "[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . When a [trial] court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light." (Citation omitted; internal quotation marks omitted.) *Antinerella* v. *Rioux*, 229 Conn. 479, 489, 642 A.2d 699 (1994). In this regard, "a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction."

(Internal quotation marks omitted.) *Dyous* v. *Psychiatric Security Review Board*, 264 Conn. 766, 773, 826 A.2d 138 (2003). "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Miller* v. *Egan*, supra, 265 Conn. 313.

In addition, the present case requires us to interpret the limitation period set forth in § 4-148 (a), specifically, the meaning of the term "injury" and the language "in the exercise of reasonable care should have been discovered," as applied to the present case. "The interpretation of a statute, as well as its applicability to a given set of facts and circumstances, involves a question of law and our review, therefore, is plenary." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 734, 830 A.2d 228 (2003). We begin our analysis with "the language of the statute, because that is the most important factor to be considered." *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003). Section 4-148 (a) provides: "Except as provided in subsection (b) of this section, no claim shall be presented under this chapter but within one year after it accrues. Claims for injury to person or damage to property shall be deemed to accrue on the date when the damage or injury is sustained or discovered or in the exercise of reasonable care should have been discovered, provided no claim shall be presented more than three years from the date of the act or event complained of."[11]

---

[11] The origin of § 4-148 (a) lies in chapter 103 of the 1901 Public Acts, entitled "An Act concerning Claims against the State," which provided: "No petition for damages for injuries to persons or property shall be heard by the general assembly unless written notice of such injuries, and a general description of the same, and the cause thereof, and of the time and place of the occurrence thereof, shall, within ninety days thereafter, be given to the attorney-general." The ninety day limitation period was decreased to

General Statutes § 52-584,[12] which contains the limitation period for actions seeking damages for personal injury generally, informs our interpretation of § 4-148 (a). Section 52-584 provides in relevant part: "No action to recover damages for injury to the person . . . caused by negligence . . . or by malpractice of a physician, surgeon . . . [or] hospital . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ." A plain reading of §§ 4-148 (a) and 52-584 reveals that the statutes are alike in most material respects. Both statutes provide that the limitation period begins to run when a plaintiff either sustains or discovers the injury or, in the exercise of reasonable care, should have discovered the injury, and both statutes contain a three year period of repose. The only material differences in the two statutes are that § 4-148 (a) allows for a one year limitation period while § 52-

sixty days by chapter 133 of the 1915 Public Acts, which remained effective until 1959. Compare Public Acts 1915, c. 133 with General Statutes (1958 Rev.) § 2-21. Section 4-148 (a), as it exists today in all material respects, was enacted by Public Acts 1959, No. 685, § 23, which was entitled "An Act Concerning the Hearing and Determination of Claims Against the State." That legislation created the rubric for presenting claims against the state under chapter 53 of the General Statutes, and has contained a one year limitation period since its inception. The legislative history that relates to Public Act No. 685, however, sheds no light on the question of when the one year limitation period begins to run.

[12] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

584 allows for a two year limitation period, and § 4-148 (a) relates only to actions against the state brought under chapter 53 of the General Statutes.

We acknowledge that our cases interpreting either § 4-148 (a) or § 52-582 have been less than consistent, and we take this opportunity to clarify the application of those statutes in this context. In that regard, although our cases make clear that the point at which a plaintiff discovered or in the exercise of reasonable care should have discovered an injury is generally a question of fact, that issue has been resolved as a matter of law on some occasions. Compare *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 810 ("determination of reasonable care is a question of fact") and *Catz* v. *Rubenstein*, supra, 201 Conn. 49 (when injury should have been discovered is question of fact) with *Merly* v. *State*, supra, 211 Conn. 208 (plaintiff failed to exercise reasonable care as matter of law) and *Burns* v. *Hartford Hospital*, 192 Conn. 451, 459–60, 472 A.2d 1257 (1984) (no issue of fact in dispute as to when plaintiff discovered injury). A discussion of these cases and their distinguishing characteristics is helpful to resolve the present case.

Both §§ 4-184 (a) and 52-584 state that the limitation period begins to run on the date when the plaintiff discovers or should have discovered the injury. In this context, we have repeatedly stated that "an injury occurs when a party suffers some form of actionable harm." (Internal quotation marks omitted.) *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 805; *Merly* v. *State*, supra, 211 Conn. 205–206; *Lambert* v. *Stovell*, 205 Conn. 1, 6, 529 A.2d 710 (1987); *Catz* v. *Rubenstein*, supra, 201 Conn. 44; *Barnes* v. *Schlein*, 192 Conn. 732, 739, 473 A.2d 1221 (1984); *Burns* v. *Hartford Hospital*, supra, 192 Conn. 460. This court first used the term "actionable harm" in 1984, in *Burns* v. *Hartford Hospital*, supra, 460.

The plaintiff in *Burns*, who was being treated for injuries that resulted from an automobile accident, was administered fluids intravenously into his lower legs. Id., 452. After the plaintiff began to complain of soreness in one of his legs, his physician, Ronald W. Cooke, determined that the leg had become infected due to contaminated intravenous tubes, which was disclosed to the plaintiff on November 10, 1975. Id., 452–53. The plaintiff was released from the hospital on November 16, 1975, and was told that his leg would heal fully with time. Id., 453.

In August, 1977, after the plaintiff had still not healed properly, the plaintiff went to a second physician. Id. It was determined that the plaintiff had a buildup of scar tissue that was impeding muscle development. Id. On November 1, 1978, the plaintiff brought an action against Cooke and the hospital, for failing to diagnose and treat his infected leg properly. Id. The trial court granted the defendants' motions for summary judgment, concluding that the statute of limitations had begun to run on November 10, 1975, the date on which the plaintiff had been told that his injury was caused by contaminated intravenous tubes. Id., 454. On appeal, we affirmed the judgment of the trial court, as to the defendant hospital only,[13] concluding that, because the plaintiff discovered his injury and its cause on November 10, 1975, the two year limitation began to run on that date. Id., 459–60. We stated: "The injury that the plaintiff attributes to the hospital's negligence, i.e., the streptococcus infection, was inflicted and discovered in November, 1975. At that point the hospital's alleged breach of duty was complete. . . . The statute requires that the injured party bring suit within two years of discovering the injury. General Statutes § 52-584. In this context an injury occurs when a party suffers some form

---

[13] The appeal as to Cooke was dismissed. *Burns* v. *Hartford Hospital,* supra, 192 Conn. 454 n.3.

of actionable harm. The harm need not have reached its fullest manifestation before the statute begins to run. Because the plaintiff did not bring suit within two years of discovering the injury, the trial court correctly ruled that the action was barred by the statute of limitations." Id., 459–60. Thus, unlike the trial court's ruling in the present case, our ruling in *Burns* rested on when the plaintiff *discovered* the injury, not when he *should have* discovered the injury.[14]

In *Catz* v. *Rubenstein*, supra, 201 Conn. 47–48, we further clarified the meaning of the word "injury" as used in § 52-584, adopting a "legal injury" construction of the word. The facts of *Catz* are as follows. The plaintiff was told by the defendant physician in August, 1979, that a breast lump was benign, and that she had a tendency to develop cysts. Id., 40. In January, 1980, the plaintiff discovered another lump, and after being seen by the defendant, was told that she had a propensity to fatty tissue and that it was not serious. Id., 40–41. In April, 1980, however, the lump had grown larger, and the defendant ordered a mammogram, which indicated a malignancy. Id., 41. The plaintiff, conceding that she was aware that she had cancer in May, 1980, brought a malpractice action on June 11, 1982, claiming that the defendant's misdiagnosis of the first lump contributed to her eventual cancer. Id. She claimed that the action was timely because she had been led to believe that the second growth was not related to the first, and that she did not discover that the first lump was related to

---

[14] *Barnes* v. *Schlein*, supra, 192 Conn. 738–39, which was decided shortly after *Burns*, did not add anything new to this issue. In *Barnes*, the plaintiff indicated in her deposition that she knew something was wrong with her leg in April, 1973, and had decided to bring an action against her physician at that time. Id., 736–37. The plaintiff did not bring an action, however, until December, 1975. Id., 738–39. Thus, as in *Burns*, the plaintiff in *Barnes* discovered the injury more than two years before she brought the action. Accordingly, we held that the trial court correctly concluded that the defendant was entitled to summary judgment pursuant to § 52-584. Id.

her eventual cancer until April, 1982, when she saw another physician. Id., 41–42. Thus, the plaintiff maintained that she did not sustain an "injury" until April 1982, the date that she discovered that the defendant had *misdiagnosed* her first growth.

The trial court granted the defendant's motion for summary judgment, concluding that the statute began to run in May, 1980, when the plaintiff found out that she had cancer. Id., 42. On appeal, we reversed, concluding that there was an issue of material fact as to the time that the plaintiff *should have* discovered a causal relationship between the defendant's omission and the metastasis of her cancer. Id., 43–44. Relying primarily on *Burns*, we stated: "A breach of duty by the defendant and a causal connection between the defendant's breach of duty and the resulting harm to the plaintiff are essential elements of a cause of action in negligence. . . . They are therefore necessary ingredients for 'actionable harm.' Consequently, the plaintiffs' decedent did not have an 'injury' as contemplated by the statute until she discovered or in the exercise of reasonable care should have discovered a causal relationship between the defendant's allegedly negligent diagnosis of August, 1979, and subsequent lack of treatment, and the metastasis of her cancer which she discovered on May 1, 1980. Only then did she sustain 'actionable harm.' " (Citations omitted.) Id., 44.

In addition, the court in *Catz* discussed the history of § 52-584. "The formulation of § 52-584 which used the term 'injury' was adopted by the legislature in 1957. The language in the statute in effect prior to that time provided that an action could be brought only within one year 'from the date of the act or omission complained of.' General Statutes (Rev. to 1949) § 8324 . . . . The testimony in 1957 before the General Law Committee of the legislature, which considered the predecessor to our present § 52-584, indicates that the use

of the term 'injury' was a conscious reaction to, and an attempt to alleviate the draconian effect of two cases, *Dincher* v. *Marlin Firearms Co.*, 198 F.2d 821 (2d Cir. 1952), and *Vilcinskas* v. *Sears, Roebuck & Co.*, 144 Conn. 170, 174, 127 A.2d 814 (1956)." (Citation omitted.) *Catz* v. *Rubenstein*, supra, 201 Conn. 46. Those cases had held that the limitation period began to run "on the date of the defendant's negligence and that a plaintiff's cause of action could be barred before the plaintiff suffered any harm and therefore before a cause of action had accrued. The use by the legislature of the word 'injury' rather than 'act or omission' in the initial part of § 52-584 was obviously a deliberate choice, as the words 'act or omission' were used in the second portion of the statute pertaining to the three year period of limitation." Id., 46–47.

In this regard, we cited favorably other jurisdictions that have concluded that "actionable harm" does not occur until the plaintiff discovers an injury *and* causation. (Internal quotation marks omitted.) Id., 47–48. Thus, we stated that "a plaintiff must have discovered or in the exercise of reasonable care should have discovered the essential elements of a possible cause of action before the statute of limitations commences to run." Id., 47. In this context, "essential elements" means that "the claimant has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury *and that the injury was caused by the wrongful conduct of another.* . . . The focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." (Emphasis added; internal quotation marks omitted.) Id. Thus, after *Catz*, it was clear that the limitation period in § 52-584 does not begin to run until a plaintiff has knowledge or in the exercise of reasonable care should have had knowledge of sufficient facts to bring a cause of action against a defendant, which, in turn, requires that a plaintiff is or

should have been aware that he or she has an injury *that was caused by the negligence of the defendant.*

The next case shedding light on this issue was *Merly* v. *State,* supra, 211 Conn. 199, which provided the basis for much of the trial court's reasoning in the present case. In *Merly,* the decedent committed suicide on July 30, 1979, while he was under the care of a state psychiatric hospital. Id., 202. The decedent's family made no attempt to pursue a claim against the state, however, until late January, 1981, when they requested the medical records and autopsy report from the office of the chief medical examiner. Id. Those records apparently revealed that the hospital was negligent because it had failed to take adequate steps to prevent the decedent's death. Id. Accordingly, on April 16, 1981, the plaintiff presented a claim to the commissioner pursuant to § 4-148, claiming that the hospital was negligent in its supervision of the decedent. Id. The commissioner dismissed the plaintiff's claim as untimely because it was presented more than one year after the decedent's death. Id. After the General Assembly passed a special act authorizing the plaintiff's claim, the trial court granted the defendant's motion for summary judgment on the ground that the special act was unconstitutional. Id., 201.

On appeal to this court, the plaintiff argued that he did not become aware of the basis for the malpractice claim, nor could he have been aware of such a claim, until he received the decedent's medical records. Id., 208. In addition, he argued that, without the medical records, he could not have received a qualified expert opinion in support of his claim. Id. Nevertheless, we held that, because the plaintiff did not start any investigation into the matter until one and one-half years after the decedent's suicide, he did not exercise reasonable care to discover the claim as a matter of law. Id. In other words, we suggested, had the plaintiff exercised

reasonable care, he would have discovered "actionable harm" sooner.[15] (Internal quotation marks omitted.) Id., 207. Although *Merly* cited *Catz* in support of its analysis, *Merly* runs contrary to *Catz* because it did not take into account the plaintiff's failure to discover that the decedent's death had been caused by the negligence of the defendant; rather, *Merly* focused solely on the plaintiff's inability to explain why he had waited so long to request the decedent's medical records. Id., 208.

The inconsistency between *Catz* and *Merly* became more apparent after *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 805, which was released in 2003. In *Taylor*, the plaintiff, who was a nurse, was admitted to the emergency room with a sore neck on March 10, 1993, and underwent a computerized axial tomography (CAT) scan. Id., 801. Upon release from the hospital, the plaintiff's discharge papers indicated that he had abnormal brain swelling. Id. Shortly thereafter, on March 12, 1993, the plaintiff experienced strange temperature sensations and unusual motor control functions. Id. Accordingly, he underwent another CAT scan. Id., 801–802. On March 16, 1993, the plaintiff was readmitted to the hospital and was told that he had suffered a stroke on March 12. Id., 802. The plaintiff never questioned the care he had received until 1995, when he read two magazine articles regarding the treatment of strokes. Id. After meeting with counsel, and reviewing his medical records for the first time, the plaintiff brought an action against the hospital on March 6, 1996, slightly less than three years from the day that he had first been told that he had suffered a stroke. Id.

---

[15] It is worth noting that we did not specify a date on which the statute actually began to run; rather we simply stated that the plaintiff did not exercise reasonable care. *Merly* v. *State*, supra, 211 Conn. 207–208. There is language in the opinion, however, that implied that the statute began to run when the family learned of the decedent's suicide, and that they presented no compelling reason for delaying their request for the medical records. See id.

At trial, the defendant requested that the trial court instruct the jury that § 52-584 imposes a duty on the plaintiff to investigate possible claims of malpractice. Id. The trial court denied the request, instructed the jury based on our language in *Catz*, and the jury returned a verdict for the plaintiff. Id., 800–801 and n.5. On appeal, we affirmed, holding that, as a matter of statutory construction, § 52-584 imposes no duty to investigate possible claims of malpractice. Id., 807. Accordingly, we upheld the instruction, which essentially stated that the two year limitation period does not begin to run until the plaintiff discovers, or should have discovered, an injury *and* causation.[16] Id.

The foregoing cases make clear that the limitation periods in §§ 4-148 (a) and 52-584 do not begin to run until a plaintiff discovers or should have discovered a

---

[16] The instruction in *Taylor* provided as follows: "The [hospital] claims that the plaintiff's action is barred by the statute of limitations. Now the [hospital] has a burden of proving by a preponderance of the evidence each of the elements of the special defense. The statute of limitations that is applicable to this action provides that a person must bring an action within two years from the date that he discovers or in the exercise of reasonable care should have discovered that he has suffered actionable harm.

"Actionable harm occurs when the plaintiff discovers or in the exercise of reasonable care or should have discovered the essential elements of a cause of action.

"Now, therefore, in order to establish that the plaintiff has discovered or reasonably should have discovered that he suffered actionable harm, the [hospital] must prove that the plaintiff discovered or should have discovered first, that the [hospital] was negligent and second, that the [hospital's] negligence was a proximate cause of his injuries.

"In the present case, I instruct you that this lawsuit was filed on March 6, 1996. In order for the [hospital] to prevail on the statute of limitations it must prove by a preponderance of the evidence that [the plaintiff] discovered or should have discovered through the exercise of reasonable care prior to March 6, 1994, that the [hospital] was negligent in its treatment of him on March 10, 1993, and further that he discovered or should have discovered by March 6, 1994, that this negligence of the [hospital] was a proximate cause of the stroke that he suffered on March 12, 1993." (Internal quotation marks omitted.) *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 800–801 n.5.

*legal* injury, i.e., actionable harm. It is also apparent, however, that *Catz* and *Taylor* stand for the proposition that actionable harm does not occur until the plaintiff discovers or should have discovered that the harm complained of *was caused by the negligence of the defendant.*[17] Finally, *Taylor* makes clear that the language "in the exercise of reasonable care should have [been] discovered" used in § 52-584, and by analogy § 4-148 (a), imposes no specific duty upon a plaintiff to investigate a potential claim of malpractice. *Burns* is not inconsistent with these principles because the plaintiff in that case knew of the causal relation between the contaminated intravenous tubes and the resulting streptococcus infection. See *Catz* v. *Rubenstein*, supra, 201 Conn. 44–45 (distinguishing *Burns*). In addition, the court in *Burns* determined the date on which the plaintiff actually discovered his injury, not the date on which he *should have* discovered his injury. *Burns* v. *Hartford Hospital*, supra, 192 Conn. 459–60. In that regard, *Burns* sheds less light on the present case than do *Catz*, *Merly* and *Taylor*.

With regards to *Merly*, however, we cannot square the result reached in that case with the principles set forth in *Catz* and *Taylor*. The dispositive fact in *Merly* was the plaintiff's failure to request the decedent's medical records sooner, which on the basis of our opinion in *Taylor*, would not be dispositive in determining whether the plaintiff exercised "reasonable care" in

---

[17] Interpreting the word "injury" to require some evidence of a causal connection between the harm complained of and the defendant's alleged negligence is consistent with the state's tort reform legislation regarding medical malpractice actions. See, e.g., General Statutes § 52-184c (a) (requiring plaintiff to establish prevailing professional standard of care); General Statutes § 52-190a (requiring plaintiff to file certificate of good faith but allowing ninety day extension of limitation period); see also, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 94, 828 A.2d 31 (2003) (discussing § 52-184c); *LeConche* v. *Elligers*, 215 Conn. 701, 707, 579 A.2d 1 (1990) (discussing § 52-190a).

discovering the injury. The court in *Merly* stated: "To hold that a claimant has an option to present his claim within one year from the actual discovery of actionable harm rather than from the time when such harm 'in the exercise of reasonable care should have been discovered' would render the latter phrase superfluous and wholly ineffective in requiring reasonable diligence on the part of claimants." *Merly* v. *State*, supra, 211 Conn. 207. In addition, the court stated: "[W]e conclude that the undisputed fact that the family, until one and one-half years after learning of the decedent's suicide, did not start any investigation into the circumstances under which it had occurred constituted as a matter of law a failure to exercise reasonable care to discover the accrual of the wrongful death claim. The plaintiff has advanced no circumstances to justify such an inordinate delay." Id., 208. To the extent that *Merly* suggests that a plaintiff's failure to request a decedent's medical records constitutes a failure to exercise reasonable care as a matter of law under §§ 4-148 (a) or 52-584, we confine that case to its facts.

With that discussion in mind, we take this opportunity to restate the correct legal standard by which to evaluate the timeliness of causes of action in negligence. The limitation period for actions in negligence begins to run on the date when the injury is first discovered or in the exercise of reasonable care should have been discovered. See General Statutes §§ 4-148 (a) and 52-584. In this regard, the term "injury" is synonymous with "legal injury" or "actionable harm." "Actionable harm" occurs when the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action. *Catz* v. *Rubenstein*, supra, 201 Conn. 44. A breach of duty by the defendant and a causal connection between the defendant's breach of duty and the resulting harm to the plaintiff are essential elements of a cause of action in negligence; they are

therefore necessary ingredients for " 'actionable harm.' " Id. Furthermore, "actionable harm" may occur when the plaintiff has knowledge of facts that would put a reasonable person on notice of the nature and extent of an injury, and that the injury was caused by the negligent conduct of another. Id., 47. In this regard, the harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run; a party need only have suffered some form of " 'actionable harm.' " Id., 43, 45. Finally, the determination of when a plaintiff in the exercise of reasonable care should have discovered "actionable harm" is ordinarily a question reserved for the trier of fact. *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 810.

With those principles in mind, we now return to the facts of the present case. The decedent died on October 8, 1992. Sometime in late 1992 and early 1993, the family received the opinions of two physicians, both of whom indicated that the decedent had received appropriate care. In August, 1994, however, the family obtained the opinion of Deckoff indicating malpractice. The plaintiff presented her notices of claim, one on behalf of the estate and one individually, to the commissioner in September and October, 1994, respectively.

On the basis of the foregoing, we conclude that the trial court applied the incorrect legal standard to the plaintiff's claim. The trial court stated: "It is clear that the commissioner . . . reviewed the facts and determined that even if the family's view of the facts is accepted uncritically, the conclusion is inescapable that the opinion of . . . Deckoff *could* have been obtained during the one year limitation period had reasonable care been exercised. . . . The issue is whether prior to August, 1994, the claimant *could* have known, had she exercised reasonable care, that the doctor and hospital staff might have been negligent in their care and treat-

ment of the decedent. . . . [The commissioner] recognized the [defendant's] position that . . . Deckoff's opinion was merely an interpretation of otherwise available information that *could* have been [discovered] in a timely manner. . . . On an independent review of the facts submitted to me, which are virtually the same as those reviewed by the . . . commissioner and those submitted to the legislature, I agree with the commissioner. Under the standard enunciated in *Lambert* [v. *Stovell*, supra, 205 Conn. 1][18] and *Burns* [v. *Hartford Hospital*, supra, 192 Conn. 451], the actionable harm accrued when the facts were known, *and the fact that the interpretive opinion favorable to the plaintiff was not known until later is immaterial.*" (Emphasis added; internal quotation marks omitted.)

There are two misapplications of the law, as we have clarified it, in the quoted portion of trial court's decision.[19] First, the trial court stated that, had the plaintiff exercised reasonable care, she *could* have discovered the injury sooner. The inquiry is not when the injury *could* have been discovered; rather, it is when the injury

---

[18] We also note our disagreement with the trial court's and the defendant's reliance on *Lambert* v. *Stovell*, supra, 205 Conn. 1. *Lambert* was an action grounded on the doctrine of informed consent, not ordinary negligence, and therefore required the plaintiff in that case to prove different elements than the plaintiff here. Id., 6. In *Lambert*, the plaintiff brought an action against his physician claiming that he would not have underwent an ankle fusion procedure if the defendant had warned him about the possibility of the resulting infection and nonunion. Id., 2. The plaintiff was told by the defendant about the resulting infection and nonunion of the ankle in the summer of 1977, yet the plaintiff did not bring an action until March, 1980. Id., 2–3. We upheld the trial court's jury instruction in that case, stating that, once the plaintiff had actual knowledge of the risk complained of, namely, the infection and nonunion of the ankle, he "was aware of circumstances indicating that he had suffered a form of 'actionable harm' and should have discovered his injury at that time." Id., 6–7. Put another way, once the plaintiff discovered the risk complained of, he had all the information necessary to bring a malpractice action based on the doctrine of informed consent.

[19] As the state of the law rested when the trial court rendered its decision, however, its reliance on the reasoning of *Merly* is certainly understandable.

*should* have been discovered. General Statutes § 4-184. Indeed, the plaintiffs in *Catz* and *Taylor could* have discovered their legal injuries sooner, but that did not compel the conclusion that they *should* have done so. Second, and more fundamentally, the trial court viewed the point at which the plaintiff had obtained Deckoff's favorable opinion as "immaterial." As previously discussed, the limitation period does not accrue until a plaintiff has knowledge of the essential elements of a cause of action. A duty owed by the defendant, a corresponding breach thereof, and a causal connection between that breach and the resulting harm to the plaintiff are essential elements of a cause of action in negligence. *Taylor* v. *Winsted Memorial Hospital*, supra, 262 Conn. 805; *Catz* v. *Rubenstein*, supra, 201 Conn. 44. In the present case, the plaintiff claims that she did not become aware that the physicians' treatment of the decedent had fallen below the standard of care until she had obtained Deckoff's favorable opinion. Thus, on the facts before the trial court, obtaining Deckoff's opinion was essential in order for the plaintiff to have knowledge that the physicians may have been negligent in their treatment of the decedent. "Only then did she sustain 'actionable harm.'" *Catz* v. *Rubenstein*, supra, 44. In the context of a motion to dismiss, taking the facts as alleged in the complaint and drawing all reasonable inferences in favor of the pleader, we cannot conclude, as a matter of law, that the plaintiff in the exercise of reasonable care should have discovered actionable harm sometime prior to obtaining Deckoff's opinion.[20]

[20] We point out, however, that our conclusion would not preclude the trier of fact, whether it be the court; see General Statutes § 4-160 (f) (actions brought under chapter 53 of the General Statutes are tried to court without jury); or a jury, from concluding, as a factual matter, and in accordance with the foregoing, that the plaintiff in the present case did not exercise reasonable care. In addition, a court would not be precluded in an appropriate case from concluding that, as a matter of law, a plaintiff's claim was untimely. We merely hold that the plaintiff's allegations in the present case were sufficient to overcome the defendant's motion to dismiss.

As previously discussed in this opinion, pursuant to *Merly* v. *State*, supra, 211 Conn. 205, because the plaintiff's claim was not untimely as a matter of law, we conclude that the trial court improperly granted the defendant's motion to dismiss on the ground that Special Act 96-16 was unconstitutional as a exclusive public emolument.[21]

Finally, we are mindful of the defendant's concern that our decision in the present case would effectively toll the limitation period until a plaintiff finally receives favorable expert opinion. First, our holding does not reach so broadly. Our opinion in the present case merely reflects the notion that whether a plaintiff exercised reasonable care is ordinarily a question of fact, and the trial court improperly concluded *as a matter of law* that the plaintiff failed to exercise such care. Second, in the absence of exceptional circumstances; see, e.g., *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 195–96, 746 A.2d 730 (2000) (repose provision tolled by continuous course of conduct doctrine); *Blanchette* v. *Barrett*, 229 Conn. 256, 275–77, 640 A.2d 74 (1994) (same); the three year repose provisions of §§ 4-148 (a) and 52-584; see footnotes 2 and 12 of this opinion; will prevent a plaintiff from unduly delaying a cause of action for more than three years from the negligent act complained of. See *Catz* v. *Rubenstein*, supra, 201 Conn. 49–50. Thus, in the unlikely event that a would-be plaintiff continues to receive one unfavorable opinion after another, that search, however reasonable, will ordinarily become a nullity after three years.

---

[21] As previously discussed; see footnote 9 of this opinion; the trial court did not address the defendant's claim that Special Act 96-16 authorized the plaintiff to bring an action only on behalf of the estate and not individually. In light of our conclusion that the commissioner improperly dismissed the plaintiff's claim initially, the import of Special Act 96-16 becomes irrelevant, and nothing in that act would prevent the plaintiff from also bringing an action individually.

The judgment is reversed and the case is remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.