# IN THE SUPREME COURT OF IOWA

No. 115 / 04–2081

Filed February 22, 2008

**GEORGIA M. RATHJE, KELLY RATHJE** and **RICHARD RATHJE,**

Appellants,

vs.

**MERCY HOSPITAL, CEDAR RAPIDS, IOWA,** and
**DWIGHT J. SCHROEDER,**

Appellees.

_____

Appeal from the Iowa District Court for Linn County, Thomas M. Horan, Judge.

District court granted summary judgment for defendants in a medical malpractice action. **REVERSED AND REMANDED.**

James P. Hayes and Karen A. Lorenzen of Hayes Lorenzen Lawyers PLC, Iowa City, and Richard H. Doyle of Galligan, Doyle & Reid, PC, Des Moines, for appellants.

David A. Elderkin and Robert M. Hogg of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellees.

**CADY, Justice.**

In this appeal, we must decide if the district court correctly granted summary judgment in a medical malpractice action based on a claim that the plaintiffs failed to file their petition within the statute of limitations. Although the district court relied on our line of prior cases in reaching its decision, we now conclude the statute of limitations for medical malpractice actions does not begin to run until discovery of both the injury and its factual cause. On our review, we reverse the decision of the district court and remand for further proceedings.

### I. Background Facts and Proceedings.

On March 19, 1999, Kelly and Richard Rathje admitted their sixteen-year-old daughter, Georgia, to an outpatient alcohol abuse treatment center at Mercy Hospital in Cedar Rapids. Part of the treatment plan developed for Georgia called for the administration of a drug called Antabuse. This drug causes the body to produce an alcohol sensitivity that results in a highly unpleasant reaction to the ingestion of beverages containing alcohol. The treatment plan called for Georgia to receive a liquid dose of Antabuse, administered by a nurse at the treatment center, twice each week.

Around a week later, Georgia began to feel sick and nauseated. She also began to experience cramps and was constipated. Georgia reported these symptoms to the nurse who administered the Antabuse at the treatment center, and the nurse suggested she consume food prior to taking Antabuse in the future.

On April 5, Kelly contacted the family's physician, Dr. Jerome Janda, to report Georgia was nauseated and frequently expelled an acid-like fluid from her stomach. Dr. Janda subsequently examined Georgia, and ordered an upper gastrointestinal test. The results of the test were

consistent with peptic disease and duodenitis, but revealed no definite ulcer or reflux disease. Dr. Janda prescribed medication for Georgia's stomach pain.

On April 20, Georgia would not eat or drink. She was suffering from abdominal pain and was vomiting a green substance. She was also fatigued. Kelly reported these symptoms to a nurse in Dr. Janda's office.

On April 23, Georgia was seen by Dr. Janda with continued complaints of nausea and constipation. Dr. Janda ordered x-rays, together with a liver function test, a blood test, and a test used to diagnose various intestinal diseases and problems. The x-rays were taken, but the other tests were not performed due to a mix-up.

On April 26, Georgia returned to Dr. Janda's office. She had been bedridden for most of the time since the previous office visit on April 23. She was nauseated, vomiting, and constipated. At this visit, Dr. Janda noticed Georgia's skin color was "mildly yellow or jaundiced and the whites of her eyes were yellowish or icteric." He again ordered the prior tests and added a test to determine the presence of any inflammation.

Georgia had blood drawn for testing at Mercy Hospital. The blood tests were performed by the hospital lab, with abnormal results. Dr. Janda informed Kelly of the test results, and Georgia was admitted to St. Luke's Hospital on April 27.

Dr. Janda consulted with a surgeon about his concern that Georgia could have gallbladder stones. A CAT scan revealed some enhancement of the gallbladder wall and some fluid around the gallbladder, but no other abnormalities. The surgeon then consulted with a gastroenterologist.

The gastroenterologist determined the jaundice and elevated liver enzymes experienced by Georgia were secondary to hepatitis. He

believed Georgia's condition might be a "drug-induced hepatitis secondary to Antabuse." He recommended Georgia stop taking all prior medications.

Georgia was discharged from St. Luke's Hospital, but promptly readmitted on April 29. She still appeared jaundiced, and her condition continued to deteriorate over the passing days. On May 5, she was transferred to the University of Iowa Hospitals and Clinics Pediatric Intensive Care Unit. She later received a liver transplant as a result of end-stage liver disease secondary to Antabuse.

On April 26, 2001, Georgia and her parents filed a petition against numerous health care providers, including Mercy and Dr. Dwight Schroeder, the medical director at the Alcohol Treatment Center at Mercy. The lawsuit claimed Dr. Schroeder and the hospital were negligent in prescribing Antabuse and in their treatment of Georgia for alcohol abuse, and this negligence was the cause of her irreversible liver damage and transplant. The Rathjes eventually dismissed all defendants from the lawsuit except Mercy Hospital and Dr. Schroeder.

Mercy Hospital and Dr. Schroeder filed answers to the petition and later were permitted to amend their answers to claim the statute-of-limitations defense. They both then subsequently moved for summary judgment based on the two-year statute of limitations.

Mercy Hospital and Dr. Schroeder claimed the statute of limitations began to run when Georgia began to experience symptoms of her injury prior to April 26, 1999. Georgia and her parents claimed the statute of limitations began to run when Georgia learned after April 26, 1999, her liver was irreversibly damaged, or, at the earliest, when her condition worsened on April 26, 1999, to include symptoms of jaundice.

The district court granted summary judgment for Mercy Hospital and Dr. Schroeder. It found the facts were undisputed that Georgia's injury had physically manifested itself well prior to April 26, 1999, more than two years before the Rathjes filed suit. Consequently, it concluded the lawsuit filed by the Rathjes was barred by the statute of limitations contained in Iowa Code section 614.1(9)(*a*) (2001).

The Rathjes appealed. They argue the district court erred in allowing Mercy to amend its answer to include a statute-of-limitations defense and further argue the district court erred in granting summary judgment for Mercy Hospital and Dr. Schroeder.[1]

**II. Standard of Review.**

We review a district court ruling granting a motion for summary judgment for correction of errors at law. *Kragnes v. City of Des Moines*, 714 N.W.2d 632, 637 (Iowa 2006).

**III. Statute of Limitations for Medical Malpractice Actions.**

This case requires us once again to visit the medical malpractice statute of limitations and apply it to the facts of a particular case. We have done this on a number of occasions since the special statute was enacted in 1975, and have developed a body of interpretative law in the process. Yet, this law has raised some questions about the fairness of

---

[1]We conclude the district court did not abuse its discretion in allowing the hospital and Dr. Schroeder to amend their petitions. *See Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 766 (Iowa 2002) ("We afford district courts considerable discretion in ruling on motions for leave to amend pleadings. Consequently, we will reverse only if the record indicates the court clearly abused its discretion." (Citations omitted.)). The Rathjes raised two primary arguments in support of their claim that the district court erred in granting summary judgment. In addition to arguing their lawsuit was filed within two years of the date the injury was discovered, the Rathjes claimed their lawsuit should survive the statute of limitations under the continuing treatment and continuum of negligent treatment doctrines. We only address the issue concerning the date of discovery of the injury in this appeal. Our resolution of this issue in favor of the Rathjes makes it unnecessary to address their claim that the district court erred in failing to adopt the continuing treatment and continuum of negligent treatment doctrines.

the outcome of a number of these cases. This perception has not gone unnoticed by us, for we have freely acknowledged the statute can "severely restrict[] the rights of unsuspecting patients." *Schlote v. Dawson,* 676 N.W.2d 187, 194 (Iowa 2004). Nevertheless, we have declined to change course, recognizing it is the role of the legislature to "address this problem." *Id.*

It is, of course, the role of the legislature to write statutes, and it is our role to interpret them based on their application in the course of litigation. Moreover, the legislature can rewrite a statute to reflect its intent when it does not believe our interpretation in a particular case has accomplished this goal. Yet, these general principles of separation of powers and fundamental duties do not totally absolve us from our continued responsibility to interpret applicable statutes in each case and, more importantly, to revisit our past interpretations if we are convinced they have not clearly captured the intent of our legislature. We adhere to precedent, but also remain committed to clarifying the law as we work with our precedent. When our interpretation of a statute has created problems in the application of the statute to subsequent cases, we should be willing to reexamine our precedent to see if our understanding of the legislative intent can be better articulated. *See Ruth v. Dight,* 453 P.2d 631, 634 (Wash. 1969) (reexamining past interpretation of statue of limitations in light of "constant intellectual bombardment").

We begin the task of revisiting our interpretation of section 614.1(9) by returning to the original statute of limitations for personal injury actions enacted by our legislature in the Nineteenth Century. This journey is necessary to put the issue we face today in perspective and to help understand the intent of our legislature in choosing the language it

used to write the statute of limitations for medical malpractice actions. As originally enacted, the statute of limitations provided:

> "The following actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially limited:  (1) Actions founded on injuries to the person . . ., whether based on contract or tort, . . . within two years."

*Fadden v. Satterlee*, 43 F. 568, 568–69 (S.D. Iowa 1890) (quoting Iowa Code § 2529).  Thus, our legislature selected the prescriptive period of time to bring a personal injury action based on tort and used the accrual of the claim as a starting point for the limitation period.  In doing so, the legislature determined a two-year period was sufficient for a reasonably diligent person to file a claim with the judicial system.[2]  *See Estate of Kuhns v. Marco*, 620 N.W.2d 488, 491 (Iowa 2000) ("Statutes of limitations establish a reasonable period of time for plaintiffs to file their claims.").  The statute was designed primarily to protect the courts and defendants from the multitude of problems that can occur in dealing with stale claims.  *Id.*; *see Schulte v. Wageman*, 465 N.W.2d 285, 286 (Iowa 1991) (recognizing the burdens of defending a claim after memories have faded, witnesses have died or disappeared, and evidence is lost).

While the legislature prescribes the period of limitation, courts have generally been called upon to determine when a claim accrues to start the running of the statute of limitations.  *See Roberts v. Sw. Cmty. Health Servs.*, 837 P.2d 442, 446 (N.M. 1992) (recognizing that, absent instructions from the legislature, courts must determine when a cause of

---

[2]All states have enacted a statute of limitations for tort victims and nearly all such statutes require the action to be filed within one to three years of the accrual of the action.  David W. Feeder II, *When Your Doctor Says, "You Have Nothing to Worry About," Don't Be Sure:  The Effect of* Fabio v. Bellomo *on Medical Malpractice Actions in Minnesota*, 78 Minn. L. Rev. 943, 950 (1994).  The vast majority of states, like Iowa, have adopted a two-year limitation period.  *Id.*

action accrues under a statute of limitations); *see also Developments in the Law of the Statute of Limitations*, 63 Harv. L. Rev. 1177, 1203–05 (1950). This task has been formidable, largely due to the manifold sequences in which the elements of a tort action can unfold and become discernible to a plaintiff as a signal to pursue a legal remedy for a wrong. *See Ruth*, 453 P.2d at 634 (recognizing that the application of statutes of limitation in medical malpractice cases has been a vexing and continuous source of judicial uncertainty).[3]

The first rule to emerge from our early statute-of-limitations cases was that a claim accrued when the injured party had a "right to institute and maintain a suit." *Chrischilles v. Griswold*, 260 Iowa 453, 461, 150 N.W.2d 94, 99 (1967), *superseded by statute*, 1975 Iowa Acts ch. 239, § 26, *as recognized in Langner v. Simpson*, 533 N.W.2d 511 (Iowa 1995); *see Dean v. Iowa-Des Moines Nat'l Bank & Trust Co.*, 227 Iowa 1239, 1242, 281 N.W. 714, 717 (1938) (explaining a cause of action does not "accrue" until the plaintiff is entitled to sue). This approach meant the statute was triggered when the commission of a tortious act caused a legally recognized injury. *See Schnebly v. Baker*, 217 N.W.2d 708, 721 (Iowa 1974) ("The general rule in tort cases is that the period of limitations commences when the tort is committed."), *overruled on other grounds by Franke v. Junko*, 366 N.W.2d 536 (Iowa 1985). It reflected the general rule of law around the country. *Id.*

We also observed early on that the tortious act committed by a defendant was not always immediately followed by the resulting injury.

---

[3]"Like most general rules of law," the rules "pertaining to 'limitations' become less than profound when an attempt is made to apply them to specific cases." *Mattingly v. Hopkins*, 253 A.2d 904, 907 (Md. 1969). This complexity primarily results when the elements of a cause of action unfold sequentially (rather than simultaneously) and can be further compounded by additional factors unique to professional malpractice. *Id.*

*Ogg v. Robb*, 181 Iowa 145, 155–56, 162 N.W. 217, 220–21 (1917); *see also United States v. Kubrick*, 444 U.S. 111, 122, 100 S. Ct. 352, 359, 62 L. Ed. 2d 259, 269 (1979) (noting "[t]hat [the plaintiff is] injured in fact may be unknown or unknowable until the injury manifests itself" and thus recognizing, at least implicitly, that the tortious act does not always temporally coincide with the injury); *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 580 (Wis. 1983) ("Although the negligence and resulting injury are often simultaneous, occasionally an injury will not be sustained until a subsequent date."). Thus, in response to a number of statute-of-limitations cases in which the injury did not occur until long after the wrongful act, our general rule for the accrual of a claim was more specifically described to commence the running of the statute of limitations for personal injury actions at the time the injury occurred. *Ogg*, 181 Iowa at 155–56, 162 N.W. at 220–21; *Gustin v. County of Jefferson*, 15 Iowa 158, 160 (1863) (declaring the statute of limitations commences to run from the time the injury is done); s*ee also Fadden*, 43 F. at 568–69 (concluding Iowa's statute of limitations in malpractice cases begins to run at the time of the injury).

This approach was logical because the injury would not always occur at the same time as the wrongful act, but no cause of action could accrue until the injury occurred. *Ogg*, 181 Iowa at 155–56, 162 N.W. at 220–21 (recognizing a cause of action accrues when damages are sustained in those cases in which the wrongful act itself does not cause an immediate legal injury, but when damages subsequently occur as a result of the act); *see also Hansen*, 335 N.W.2d at 580 (holding the injury is the triggering event because the injury may occur after the negligent act). Thus, we transformed the general rule to more accurately describe that a claim did not accrue under the statute of limitations until the

injury occurred. Of course, there was no change in the rule that the statute of limitations began to run even if the plaintiff had not discovered the injury or its cause. The early case of *Ogg* illustrates this approach.

In *Ogg*, the plaintiff suffered burns on his arms as a result of x-rays taken by the doctor after he broke his wrist. 181 Iowa at 147, 162 N.W. at 218. This event occurred in 1901. *Id.* In 1912, the plaintiff developed cancer in his arm, resulting in amputation. *Id.* In 1915, he brought a negligence action against the doctor, alleging the x-rays caused the cancer. *Id.* at 147, 162 N.W. at 219. After finding no evidence of fraudulent concealment of the tort by the physician, the court concluded the cause of action accrued at the time of the burn in 1901, and the action was therefore barred by the statute of limitations. *Id.* at 155–65, 162 N.W. at 220–21. This approach reaffirmed the bright-line rule, but frequently left victims who were unable to discover their injuries within the statute-of-limitations period, through no fault of their own, without any remedy.

Application of the general statute of limitations based on the occurrence of the injury was followed well into the Twentieth Century. The individual hardship visited on those plaintiffs who failed to discover the injury before the end of the statute-of-limitations period was largely considered to be the price paid to achieve the greater societal goals of the statute of limitations. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 30, at 165 (5th ed. 1984). Yet, the Iowa legislature was not totally unsympathetic to litigants who were unaware of their rights until after the statute of limitations had run. In 1860, the legislature enacted a separate statute of limitations for actions based on fraud that delayed the accrual of the action until the fraud was discovered. Iowa

Code § 2741 (1860). The statute was consistent with the established English statute of limitations

> that where the party against whom a cause of action existed in favor of another, by fraud or actual fraudulent concealment prevented such other from obtaining knowledge thereof, the statute would only commence to run from the time the right of action was discovered, or might, by the use of diligence, have been discovered.

*Dist. Twp. of Boomer v. French,* 40 Iowa 601, 607 (1875). The Iowa statute was later amended to add actions for trespass to property to the exception, *see* 1868 Iowa Acts ch. 167, § 9, and still later, in 1873, to add actions grounded on mistake, *see* Iowa Code § 2530 (1873). *See Beerman v. Beerman,* 225 Iowa 48, 51–52, 279 N.W. 449, 450–51 (1938) (tracing the evolution of what was then Iowa Code section 11010 (1935)).[4]

During the time we maintained allegiance to the bright-line rule that the statute of limitations for personal injury actions commenced at the time the injury occurred, we began to develop a body of law surrounding the common-law discovery rule. In applying the discovery rule to the specific legislative exceptions, we held that actual knowledge of the fraud and other wrongs was not required before the statute of limitations began to run. Instead, we declared:

> The "discovery" of the fraud or wrong which will set the statute in motion does not necessarily mean actual and direct personal knowledge by the complaining party. It is sufficient if such party has such knowledge or notice as would lead a man of reasonable prudence to make inquiries which would disclose the fraud.

*Van Wechel v. Van Wechel,* 178 Iowa 491, 496, 159 N.W. 1039, 1041 (1916) (citing *E.B. Piekenbrock & Sons v. Knoer,* 136 Iowa 534, 538, 114

---

[4]Statutory exceptions for actions based on fraud, mistake, and trespass to land remain today and are codified in section 614.4.

N.W. 200, 201 (1907)). Thus, we introduced into our discovery rule jurisprudence the concept that the knowledge needed to start the statute of limitations only meant that the plaintiff needed that amount of information to allow a reasonably prudent person to discover the fraud or wrong by making inquiries. This concept later became known as "inquiry notice." *See Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985).

While the discovery rule began to take root in Iowa, its impact on the general statute of limitations remained limited. Other jurisdictions, however, began to apply the "discovery rule" to the general statute of limitations for personal injury tort claims. This broader application of the discovery rule was in response to the harshness of the prevailing rule to unsuspecting plaintiffs who were blamelessly ignorant of their legal rights. In the same year we rejected the discovery rule in *Ogg*, Maryland became the first, or arguably the first, state in the nation to apply the discovery rule to a medical malpractice case. *See* Note, *The Statute of Limitations in Actions for Undiscovered Malpractice*, 12 Wyo. L.J. 30, 34 (1957) (suggesting Maryland was the first court to adopt a discovery rule in malpractice claims). In *Hahn v. Claybrook*, 100 A. 83 (Md. 1917), a plaintiff brought a malpractice action against her doctor, claiming the doctor negligently prescribed argentum oxide for a six-year period between 1904 and 1910. *Hahn*, 100 A. at 84. The plaintiff claimed the excessive quantities of the drug caused silver poisoning, a chronic discoloration of the skin. *Id.* The Maryland court determined the discoloration of her skin was apparent by 1908, and

> was a sufficient indication of an injury, to have put her upon notice and inquiry, and it is clear from the evidence that if she had exercised ordinary care and diligence to have ascertained her rights, she could have discovered the cause of her alleged injury.

*Id.* at 86. Consequently, the court held the statute of limitations began to run at the time the plaintiff first noticed her skin discoloration in 1908, not when the doctor began prescribing the drug. *Id.*

The application of the discovery rule to the general statute of limitations grew in popularity throughout the Twentieth Century, although not all jurisdictions utilized the same event to trigger the statute of limitations under the discovery rule. *See Roberts*, 837 P.2d at 449 (recognizing a shift in the weight of authority towards the discovery rule); A. Sonerstein, *A Discovery Rule in Medical Malpractice: Massachusetts Joins the Fold*, 3 W. New Eng. L. Rev. 433, 433–34 & n.1 (1981) (listing forty-one jurisdictions that adopted the discovery rule in some form); W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 30 (5th ed. 1984 & Supp. 1988) (recognizing a wave of decisions and legislative enactments adopting the discovery rule). The decision that gave the movement its greatest thrust was *Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949), an action under the Federal Employers Liability Act in which the plaintiff contracted silicosis from his work environment over a ten-year period, but his condition was not diagnosed until two weeks after he became too ill to work. *Urie*, 337 U.S. at 165–66, 59 S. Ct. at 1022–23, 93 L. Ed. at 1290. The Court rejected the claim that the injury occurred years prior to a diagnosis and held the claim did not accrue until the disease manifested itself. *Id.* at 169–70, 69 S. Ct. at 1024, 93 L. Ed. at 1292–93.

In 1967, Iowa joined the parade of states to apply the discovery rule to the general statute of limitations. In *Chrischilles*, we recognized the national trend toward adopting the discovery rule as the better approach for claims based on negligence. 260 Iowa at 461, 150 N.W.2d at 100. We also observed with approval that the discovery rule as

defined in other jurisdictions meant the statute of limitations did not begin to run until the date "the wrongful act" was discovered or should have been discovered. *Id.* Yet, we ultimately held that actions for negligence do not accrue until the plaintiff discovers or should have discovered "the injury to his interest." *Id.* The distinction between "the wrongful act" and "the injury" as the triggering event went unnoticed.

Seven years later, we applied the discovery rule to the general statute of limitations in a medical malpractice action. In *Baines v. Blenderman,* 223 N.W.2d 199 (Iowa 1974), *superseded by statute,* 1975 Iowa Acts ch. 239, § 26, *as recognized in Langner,* 533 N.W.2d 511, the plaintiff, Baines, awoke from surgery on a herniated disk and was unable to see out of his right eye. *Baines,* 223 N.W.2d at 202. The surgery took place on March 30, 1970. *Id.* at 200. A treating physician told Baines the condition was temporary. *Id.* Baines, however, was eventually examined by another doctor on July 15, 1970. *Id.* at 201. This doctor informed Baines his vision loss could have been caused by the deprivation of blood to his eye during the surgery and his condition was permanent. *Id.* Baines filed an action against the surgeon more than two years after the surgery but less than two years after he was informed of the probable cause of his condition and that his condition was permanent. *Id.* at 200–01.

The doctor moved for summary judgment based on the statute of limitations, and Baines invoked the discovery rule. *Id.* at 201. Baines claimed he was unaware of his cause of action under the discovery rule adopted in *Chrischilles* until he was informed on July 15, 1970, that his injury was permanent and he learned how it likely occurred. *Id.* The doctor claimed the statute of limitations began to run when Baines awoke from surgery because this was the date he knew of his injury

(blindness) and knew it resulted from surgery. *Id.* Thus, the question was whether discovery of the cause of action, to commence the running of the statute of limitations, should include the element of the negligence of the physician.

We resolved the dispute over the application of the discovery rule by holding that a claim did not accrue under the discovery rule to trigger the statute of limitations until the plaintiff knew or should have known of the existence of the cause of action. *Id.* at 202. More specifically, we held a plaintiff must not only discover the injury and its cause, but must also discover the physician was negligent. *Id.* Yet, we reached this conclusion without acknowledging the rule followed in other jurisdictions that discovery of the injury and its factual cause triggers the statute of limitations. *See Kubrick*, 444 U.S. at 122, 100 S. Ct. at 359, 62 L. Ed. 2d at 269 (setting forth the rule that discovery of the injury and its factual cause triggers the statute of limitations); *Maestas v. Zager*, 152 P.3d 141, 147 (N.M. 2007) (clarifying that their cases since the adoption of the discovery rule to the medical malpractice statute of limitations were consistent with the holding in *Kubrick*). As in *Chrischilles*, we simply assumed the discovery rule meant the statute of limitations was triggered upon discovery of the cause of action, which included the negligence of the physician, and gave no consideration to a discovery rule that would trigger commencement of the limitations period upon actual or imputed knowledge of the injury and its cause.

Importantly, at the time *Baines* was decided, two movements had surfaced in courts around the nation as a result of the discovery-rule trend sweeping the country. First, two main distinct legal theories emerged from our nation's state and federal courts to govern the triggering event for the discovery rule. Conceptually, the national

movement responsible for introducing the discovery rule into the statute of limitations merely transformed the commencement of the limitation period from the date the elements of the cause of action occurred to the date the elements were discovered. The difficult subissue, however, was how the discovery rule should be applied to the elements of the claim, i.e., whether or not it should be applied to all of the elements. Most state courts, as we did in *Baines*, triggered the discovery rule upon knowledge of the cause of action, including at least some knowledge that the conduct of the physician was negligent or wrongful. *See Baines*, 223 N.W.2d at 202; *see also Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 428 (D.C. 1986) (noting that all states that have considered the question of when a statute of limitations is triggered under the discovery rule require either knowledge of some evidence of wrongdoing or knowledge of all elements of a cause of action); *Mastro v. Brodie*, 682 P.2d 1162, 1168 (Colo. 1984) (observing "[t]he overwhelming majority" of state courts have interpreted "the injury" that triggers a medical malpractice action to mean discovery of "legal injury"); *Lillicrap v. Martin*, 591 A.2d 41, 46 (Vt. 1989) (explaining that the "clear trend among the courts of the nation" is to commence medical malpractice statutes of limitation upon discovery of "legal injury," so that the plaintiff must discover the injury and the fact that it was caused by the defendant's negligence). Other courts interpreted the discovery rule more narrowly to require only knowledge of the injury and its factual cause, without requiring discovery of any negligence or possible wrongdoing. *See Kubrick*, 444 U.S. at 122, 100 S. Ct. at 359, 62 L. Ed. 2d at 269; *Maestas*, 152 P.3d at 147; *see also Lindsay v. Romano*, 696 N.E.2d 520, 522 (Mass. 1998) (holding it is not necessary for plaintiff to have notice defendant was actually responsible for the injury, only that plaintiff have

notice the medical care may have caused the injury). In fact, many courts made the choice between the two theories without recognizing there was even a choice to be made, and others vacillated back and forth with little recognition they were doing so. *See Roberts*, 837 P.2d at 448 (recognizing the existence of conflicting cases).

More importantly, many courts failed to precisely describe the full meaning of their rule governing the breadth of knowledge required to trigger the statute of limitations, which has made it difficult at times to discern which rule was actually followed. Instead, courts in the discovery rule era would refer to their accrual rule in shorthand, just as we did in describing when a cause of action accrued prior to the adoption of the discovery rule. For instance, courts would simply declare the statute of limitations commenced upon discovery of the "injury," when a full articulation of the rule would have revealed whether they required discovery of all the elements of the cause of action, or merely discovery of the injury and its cause. This phenomenon was aptly described by the New Hampshire Supreme Court:

> One might read several discovery cases and conclude that the courts are applying two substantively distinct rules. In most cases the courts frame the rule in terms of the plaintiff's discovery of the causal relationship between his injury and the defendant's conduct. In some cases, . . . a court will state simply that, under the discovery rule, a cause of action accrues when the plaintiff discovers or should have discovered his injury. Still other courts use both statements of the rule within the same case. The reason for these apparent differences is that in most cases in which the court states the rule in terms of the discovery of the injury, the injury is the kind that puts the plaintiff on notice that his rights have been violated. Thus, there is no reason for the court to express the rule in terms of the discovery of the causal connection between the harm and the defendant's conduct. In a case, such as the one before us, in which the injury and the discovery of the causal relationship do not occur simultaneously, it is important to articulate exactly what the discovery rule means. We believe that the

> proper formulation of the rule and the one that will cause the least confusion is the one adopted by the majority of the courts: A cause of action will not accrue under the discovery rule until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct.

*Raymond v. Eli Lilly & Co.*, 371 A.2d 170, 174 (N.H. 1977).

The national trend of using the term "injury" to describe the triggering event under the discovery rule not only meant the term continued in its former capacity as a designation of the time of accrual, but it continued to reflect a larger meaning than the concept of physical harm. Yet, on occasion, this background was not fully captured, which gave rise to the suggestion from time to time that the discovery rule only looked to the injury to commence the running of the period of limitation, without any requirement of knowledge of its cause or the physician's wrongdoing. *See Lillicrap*, 591 A.2d at 45 (citing *Allen v. Newport*, 427 F. Supp. 42, 44 (M.D. Tenn. 1976); *Layton v. Allen*, 246 A.2d 794, 798 (Del. 1968); *Condon v. A.H. Robins Co.*, 349 N.W.2d 622, 627 (Neb. 1984)); *see also Mastro*, 682 P.2d at 1167 (recognizing a statute of limitations that uses discovery of the "injury" to trigger the limitation period can be interpreted to mean the date the injury manifests itself in a physical, objective manner). However, this interpretation was consistently rejected, when properly scrutinized, as inconsistent with the purpose of the discovery rule. *See Lillicrap*, 591 A.2d at 45–46; *Borello v. United States Oil Co.*, 388 N.W.2d 140, 145 (Wis. 1986) ("[M]ere knowledge of the fact of an injury and nothing more will not trigger the commencement of the period of limitations."). The cases cited from time to time for the proposition that the statute of limitations commences upon discovery of the injury did not include a supporting rationale. Instead, the cases expressed the concept in the context of circumstances

where factual causation was known by the plaintiff or where the court intended to include causation in fact as an element of the discovery of the injury without specifically mentioning it. *See Allen*, 427 F. Supp. at 44–45 (holding statute of limitations commenced upon discovery of "physical injury, rather than an act of negligence"; yet the element of factual causation was never at issue in the case because the nature of the injury was such that the discovery of the factual cause would have occurred at the same time as the discovery of the injury); *Bussineau*, 518 A.2d at 426 ("Although the language of our [prior] holding . . . refers only to the time when a plaintiff has or should have 'knowledge of injury,' the facts of the case and the analysis engaged in by the court make it clear that we required a finding of more than mere knowledge of injury . . . ."); *Booth v. Wiley*, 839 N.E.2d 1168, 1172 (Ind. 2005) (citing example of one of its prior medical malpractice statute-of-limitations cases that "summarily referred to a plaintiff's discovery of injury without any specific reference to the discovery of the malpractice itself," but without intending to retreat from its rule that requires knowledge of the malpractice and resulting injury to trigger the statute of limitations). No court at the time expressed a principled notion that the cause of action accrued under the discovery rule based on mere knowledge of the injury.

The second circumstance of importance at the time *Baines* was decided was the concomitant drumbeat of tort reform sweeping the country, predicated on claims of a mounting medical malpractice crisis. *See generally Anderson v. Wagner*, 402 N.E.2d 560, 563–64 (Ill. 1979) (discussing "medical malpractice crisis" and discovery rule). One common reform centered on the need to tighten the statute of limitations to reduce a physician's exposure to future liability for malpractice lawsuits. In particular, as the popularity of the discovery rule (that often

delayed the running of the statute of limitations that otherwise would have commenced under the former bright-line occurrence-of-injury rule) picked up steam in the 1960s, the medical malpractice insurance industry began to increase premiums to protect against the resulting "long tail" of potential liability. *Id.*; *Austin v. Litvak*, 682 P.2d 41, 44–45 (Colo. 1984) (citing Howard A. Learner, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143 (1981)). In response to this problem, "various state and national commissions recommended placing an outside limit on the discovery rule in medical malpractice cases." *Anderson*, 402 N.E.2d at 565–66 (citing American Bar Association, *Report of the Commission on Medical Professional Liability* 140–43 (1977); Medical Injury Insurance Reparations Commission, *Report and Recommendation to Governor Dan Walker and Members of the 79th General Assembly* (Ill. 1976); Medical Malpractice: The Duke L.J. Symposium 253–54 (1977)). Iowa joined in with its own legislative study. *See Koppes v. Pearson*, 384 N.W.2d 381, 384 (Iowa 1986) (noting the Iowa legislature undertook a comprehensive study, resulting in a malpractice injury study committee). As a result, statutes of repose, which bar medical malpractice claims after a specific period of time regardless of the date of discovery, were proposed "to reduce malpractice premiums by eliminating the insurance companies' inability to predict future claims and losses." *Austin*, 682 P.2d at 46. Clearly, the medical malpractice crisis was not a fight over the adoption and definition of the discovery rule, but a reform movement to achieve restrictions on the discovery rule to accommodate the problems it presented to the insurance industry and medical field due to the open-ended liability. *See Koppes*, 384 N.W.2d at 384 (noting the existence of a

"critical situation . . . because of the high cost and impending unavailability of medical malpractice insurance").

The reform became particularly relevant to Iowa after *Baines* made the discovery rule specifically applicable to medical malpractice cases. Thus, the *Baines* case set the stage for Iowa's adoption of the national tort reform proposal of a statute to place an outside limit on the applicability of the discovery rule in medical malpractice actions.

In 1975, one year following *Baines*, the Iowa legislature enacted Iowa Code section 614.1(9)(*a*) as a specific exception to the general statute of limitations for malpractice actions against a specific group of medical personnel and medical facilities. *See* 1975 Iowa Acts ch. 239, § 26. The statute maintained the two-year limitation period, adopted the discovery rule, and placed a six-year period of repose on the applicability of the discovery rule as proposed by the reform movement. The statute of repose provided an outside limitation for all lawsuits, even though the injury had not been discovered.

Since the enactment of the statute, the dispute in Iowa has not involved the adoption of the discovery rule or the six-year period of repose. Instead, the dispute has mostly centered on the extent to which the legislature intended to restrict the triggering event for the two-year limitation. While the Iowa legislature adopted the discovery rule concept, it defined the rule to begin the two-year statute of limitations when the patient "knew, or through the use of reasonable diligence should have known [of], . . . the injury or death for which damages are sought in the action." Iowa Code § 614.1(9). In contrast, the definition of the discovery rule in *Baines* provided for the cause of action to accrue not only upon the discovery of the injury and its cause, but also the discovery of the negligent conduct.

In our first cases to address section 614.1(9) following its enactment, we observed the legislative purpose behind the statute was "to restrict the *Baines* discovery rule." *Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 50 (Iowa 1990); *see also Koppes*, 384 N.W.2d at 387 (citing *Farnum v. G.D. Searle & Co.*, 339 N.W.2d 392, 395 (Iowa 1983)); *Kohrt v. Yetter*, 344 N.W.2d 245, 247 (Iowa 1984). Yet, we did not begin to analyze the specific statutory restriction placed on the discovery rule until *Schultze.*

In *Schultze*, a patient was admitted to a hospital for treatment of a hip fracture and died seventeen days later. 463 N.W.2d at 48. Her personal representative eventually sued the hospital and treating physicians for malpractice by filing a claim more than two years after the death, but less than two years after the plaintiff discovered the alleged negligence of the physicians. *Id.* We concluded the lawsuit was untimely under the statute because the discovery rule did not delay the running of the statute until the plaintiff discovered the wrongful act. *Id.* at 49–50. We focused on the triggering event used by the legislature under the statute—injury or death—and found neither the plain language of the statute nor the history of the statute permitted us to inject any modifying language that the injury or death be wrongful. *Id.* In reviewing the legislative history, however, we did not acknowledge or discuss the two different triggering events recognized around the country or how the concept of an injury in the context of a statute of limitations traditionally embraced other elements of the claim. Instead, we observed the discovery rule was generally inapplicable to wrongful-death claims because death from medical care is the type of event that should give rise to the duty to investigate a cause of action. *Id.* at 50.

Our first occasion to substantively address section 614.1(9)(*a*) in the context of a medical malpractice injury claim was *Langner v. Simpson*, 533 N.W.2d 511 (Iowa 1995). There, we said:

> Subsection 9 means the statute of limitations now begins to run when the patient knew, or through the use of reasonable diligence should have known, of the injury for which damages are sought. The statute begins to run even though the patient does not know the physician had negligently caused the injury.

*Id.* at 517. We also formally read inquiry notice into the application of the statute and indicated the duty to investigate begins "once a person is aware that a problem exists." *Id.* at 518. The "injury" claimed to have been suffered in *Langner* was posttraumatic stress disorder allegedly caused, in part, by the rude bedside statements of a treating psychiatrist. The plaintiff's "problem" surfaced so as to give rise to a duty to investigate at the time the conduct of the psychiatrist hurt her feelings, even though she did not understand the medical reasons why the conduct adversely affected her. *Id.*

We next made a passing reference to the statute of limitations for medical malpractice claims in *McClendon v. Beck*, 569 N.W.2d 382, 386 (Iowa 1997). There, we referred to the plaintiff's injury as "constant pain" following her surgery and found the "district court correctly concluded that the constant pain experienced by McClendon following the operations was sufficient to put her on notice of the injury" for which she claimed damages. *Id.*

We next faced the statute in *Schlote v. Dawson*, 676 N.W.2d 187 (Iowa 2004). In that case, the patient brought a malpractice action against a physician based on a claim that the physician negligently treated a throat condition by unnecessarily removing his voice box. *Id.* at 189. However, the patient did not discover the surgery may have been

unnecessary until more than two years later and, consequently, filed the lawsuit more than two years after the voice box was removed. *Id.* Relying primarily on *Schultze*, we determined the legislature intended the word "injury," to refer to its common dictionary meaning of physical harm, as opposed to its legal meaning involving the violation of a right or protected interest. *Id.* at 192–93. Additionally, we concluded the legislature must have intended for the statute, as a direct response to *Baines*, to exclude any consideration of wrongful conduct in applying the discovery rule. *Id.* at 194. Consequently, we found the statute of limitations began to run when the plaintiff knew the fact of his injury, even though the plaintiff did not know of the physician's wrongful conduct. *Id.*

We last considered the statute of limitations in *Ratcliff v. Graether*, 697 N.W.2d 119 (Iowa 2005). In that case, the plaintiff experienced blurry vision following LASIK eye surgery. *Id.* at 121. Relying on our view in *Schlote* that "injury" for purposes of the discovery rule merely meant physical harm, apart from any notion that the harm was wrongful, we found Ratcliff was put on inquiry notice of his injury the day after his surgery and later gained actual knowledge as a result of his investigative finding that his doctor may have been legally responsible for the harm. *Id.* at 124. Because these events occurred more than two years prior to the time he filed his lawsuit, his claim was barred. *Id.*

As a whole, our cases interpreting section 614.1(9) have given rise to the rule that the statute of limitations begins to run when the plaintiff knows or, through the use of reasonable diligence, should have known of the physical harm. *Langner*, 533 N.W.2d at 517. Moreover, we have narrowly defined the injury as physical harm and have applied inquiry notice to commence the statute of limitations once symptoms of the

physical harm are experienced by a patient during or after medical treatment, even though there is no indication of a cause or negligent conduct by the doctor. Consequently, we have severely restricted the discovery rule, essentially using it to require only inquiry notice of physical harm. *See Schlote*, 676 N.W.2d at 194 (recognizing our interpretation of section 614.1(9) effectively eliminates the discovery rule from medical malpractice actions). In narrowly construing the statute as not requiring discovery of the negligent conduct of the physician, we have not considered the role of any form of causation as a part of the analysis.

In applying this case law to the undisputed facts of the summary judgment proceedings in this case, it is clear the Rathjes were placed on inquiry notice when Georgia was suffering from physical harm prior to April 26, 1999, more than two years prior to filing the petition. She was experiencing increasing signs of physical harm to her body, which an investigation revealed within two years from the time of the onset of the symptoms was caused by the administration of Antabuse. Under the rule applied in *Schlote*, the Rathjes failed to timely file their petition, even though they had no idea of the cause of the harm prior to the commencement of the statute of limitations. Thus, we are again faced with the prospect of applying the statute of limitations to deny an unsuspecting plaintiff of the right to pursue a claim for medical malpractice.

Understanding the consequences of this state of the law, the Rathjes attempt to sidestep this result by arguing the relevant injury for the purpose of the statute of limitations is not the symptoms Georgia experienced prior to April 26, 1999, but the later damage to her liver. They claim the liver damage is the injury that is the basis for the lawsuit,

and this injury was not discovered, or could not have been reasonably discovered, until after April 26, 1999.

The approach advocated by the Rathjes gives rise to concerns about allowing plaintiffs to separate injuries and only leads to additional problems in an already troubled area of the law. *See LeBeau v. Dimig*, 446 N.W.2d 800, 802–03 (Iowa 1989). Our law does not allow the splitting of a cause of action, and any effort to do so to avoid the commencement of the statute of limitations would be inconsistent with the purpose of cutting off stale claims. *Id.*

While we agree with our prior observation that the enactment of section 614.1(9) was a "direct response to our decision . . . in *Baines*," the circumstances at the time of the enactment reveal the response was not primarily directed at the reasoning we used in *Baines* to support our adoption of the discovery rule. Instead, the legislature was largely reacting to the national movement for a statute of repose as a response to the prevailing trend toward the adoption of the discovery rule in medical malpractice cases. *Baines*, of course, made the movement particularly relevant in Iowa by 1975. Yet, there was no similar organized legislative movement that would indicate our legislature intended for the physical injury, alone, to serve as the triggering event under the discovery rule.

Nevertheless, the *Baines* decision did present a clear choice between two distinct triggering events. As mentioned, the doctor in *Baines* argued that the cause of action should accrue under the discovery rule when the patient knows or should know of the injury and that it was caused by medical care. *Baines*, 223 N.W.2d at 201. Instead, we adopted the rule that the cause of action accrued when the patient knew or should have known of the injury and that it was caused by the

negligence of the medical provider. *Id.* at 202. Thus, the legislature could very well have intended to make its own choice by enacting the statutory language that tied the discovery rule to actual or implied knowledge of "the injury." Yet, we cannot identify any outside circumstance to support an intention for our legislature to enact section 614.1(9), in response to *Baines*, to strip the triggering event under the discovery rule down to the bare bones of the common definition of an "injury." In fact, in an article written and published shortly after the enactment of section 614.1(9), the legislative counsel for the Iowa Medical Society explained the two-part effect of the new medical malpractice statute of limitations was to change the triggering event for the two-year statute-of-limitations period from "the time the injured person knew he had a cause of action, i.e., that the physician was negligent" to the "date of discovery of the injury . . . but not more than six years from the occurrence." James B. West, *Iowa Medical Liability Legislation—A Summary of House File 803*, 65 Iowa Med. Soc'y J. 493, 496 (1975). Clearly, the legislature intended to reject discovery of the physician's negligence as a triggering event for the discovery rule, but there was no indication the legislature intended to also reject causation as a component of the discovery of the injury.

The actual debate over the triggering event reflected in the national case law at the time the legislature adopted section 614.1(9) in 1975 was not over discovery of the cause of action versus discovery of the existence of physical harm, but rather whether the discovery of the cause of action required actual or imputed knowledge that the physician breached a duty of care. There was no indication our legislature sought to narrow the triggering event to something other than the two prevailing schools of thought or something other than the two choices presented in *Baines.*

This dispute over the triggering event was aptly illustrated in *Kubrick,* 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259.

In *Kubrick,* a patient brought a medical malpractice action under the Federal Tort Claims Act to recover for a loss of hearing that allegedly resulted from prior treatment he received for an infection to his leg. *Id.* at 113–15, 100 S. Ct. at 355, 62 L. Ed. 2d at 264. The patient knew of his hearing loss more than two years before filing his petition and knew it was most likely caused by the drug used to irrigate the leg infection. *Id.* However, the patient did not discover the treating physician should have known that using the drug to treat the infection would cause hearing loss until less than two years before filing the petition. *Id.* at 115, 100 S. Ct. at 356, 62 L. Ed. 2d at 265.

The district court and the United States Third Circuit Court of Appeals held the claim did not accrue under the two-year statute of limitations until the plaintiff discovered the possibility that the treatment provided by the physician was negligent (i.e., a breach of a legal duty), even though the patient knew of the injury and knew the physician was responsible for the injury. *Id.* at 115–16, 100 S. Ct. at 356, 62 L. Ed. 2d at 265–66. Thus, the only thing the patient did not know was that the responsible conduct constituted negligence.

The United States Supreme Court rejected the concept that the discovery rule required knowledge of the actual legal cause before the statute of limitations began to run. It explained the rationale for only using discovery of the injury and its factual cause to trigger the discovery rule for purposes of the statute of limitations instead of also requiring knowledge of negligent treatment, as follows:

> That [the plaintiff] has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative

> defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Id.* at 122, 100 S. Ct. at 359, 62 L. Ed. 2d at 269. For these reasons, the plaintiff's lack of awareness that the "injury was negligently inflicted" does not postpone the commencement of the limitations period under this approach. *Id.* at 123, 100 S. Ct. at 360, 62 L. Ed. 2d at 270.

Importantly, the *Kubrick* case illustrates that the ongoing dispute over the application of the discovery rule to the statute of limitations was limited to the question of whether knowledge that the conduct of the doctor was negligent was needed to trigger the statute of limitations. There was no suggestion that knowledge of an injury, without more, triggered the statute of limitations.

Considering the pervasive national adoption of the discovery rule at the time Iowa enacted its statute, we think our legislature had to be aware of the debate over the triggering event and whether the discovery rule should include discovery that the defendant's conduct was negligent. *See Roberts*, 837 P.2d at 446 (considering the wide-ranging movement for medical malpractice legislation at the time and observing that the legislature must have canvassed the current trends). Moreover, this was the precise debate waged in *Baines*, the case that prompted our legislature to enact the statute of limitations for medical malpractice actions. Thus, it would have been reasonable for our legislature to intend to adopt what would become the rule in *Kubrick*, rejecting the rule in *Baines*. Additionally, it would have been reasonable for our legislature to adopt a *Kubrick*-type rule by using the term "injury" in the statute,

since that term had been used for more than a century in the context of a statute of limitations to mean more than physical harm. The contemporary circumstances do not reasonably suggest our legislature actually sought to narrow the triggering event for the statute of limitations to discovery of a mere "physical injury." Thus, our past cases have correctly observed that "the statute begins to run even though the patient does not know the physician had negligently caused the injury." *Langner*, 533 N.W.2d at 517. Our past cases have also correctly identified that our legislature did not intend the word "injury" in the statute to mean legal injury, but only physical injury. *Schlote*, 676 N.W.2d at 193 (determining the legislature had physical harm in mind when using the word "injury"). Legal injury encompasses the violation of the rights for which an action to recover damages may be brought. *See id.* at 192. This was the view we adopted in *Baines* and the view rejected by our legislature in enacting section 614.1(9).

While we have correctly discerned that the legislature clearly narrowed the discovery rule under the statute to exclude any requirement that a plaintiff discover that the injury was caused by negligence or wrongdoing of the physician, our prior cases have failed to identify the role of factual causation as an element of the statutory discovery rule. As experienced in other jurisdictions from time to time, we have applied the discovery rule literally in terms of "the injury" and have neglected to affirmatively acknowledge the role and necessity of any type of causation in the analysis. Yet, this result is understandable because each time we have considered the statute since its enactment the factual cause of the injury was not at issue. Instead, the factual cause was known or discovered at the time the injury was discovered. In particular, when we stated in *Langner* that the statute began to run upon

discovery of the injury, the plaintiff knew at the time the injury was discovered that it was caused by care provided by the physician. 533 N.W.2d at 515. Similarly, even the injury identified in *Schlote* was known by the patient to be factually caused by the physician at the time the injury was discovered. 676 N.W.2d at 189. Accordingly, we have never had to address the continued necessity of knowledge of some form of causation until this case, in which the injury and its cause in fact were not known simultaneously. Thus, when we said in *Langner* that a patient only needs to be "aware that a problem exists" to commence the statute of limitations, the "problem" necessarily embraced the cause in fact of the injury. As identified in *Kubrick*, this type of causation is necessary so there are enough facts to alert a reasonable person that the injury and its cause should be investigated. Of course, it is not important in this case, for the purposes of the statute of limitations, to discover if the conduct was negligent, only that the conduct of the physician was factually responsible for the injury.

This view is also supported by our application of inquiry notice to the discovery rule. Inquiry notice plays a role in the medical malpractice statute due to the implied knowledge ("should have known") component of the statute. This component charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed. *See Franzen*, 377 N.W.2d at 662. Under the statute, once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate "the injury," the limitation period begins to run. *Id.* The acquisition of this information is notice that imposes a duty to make a factual inquiry into the existence of the injury. The statute of limitations is triggered upon the acquisition of this information because, once a plaintiff is "armed with the facts about the harm done to him, [the

plaintiff] can protect himself [from the statute of limitations] by seeking advice in the medical and legal community." *See Kubrick*, 444 U.S. at 123, 100 S. Ct. at 360, 62 L. Ed. 2d at 270.

If the limitation period to file a lawsuit under the statute is interpreted to commence once plaintiffs gain sufficient information of the injury or physical harm without regard to its cause, some plaintiffs may not know enough to understand the need to seek expert advice about the possibility of a lawsuit to protect themselves from the statute. In some instances, the cause of medical malpractice injuries may be evident from facts of the injury alone, but in other cases it may not. Yet, in all cases, a plaintiff must at least know the cause of the injury resulted or may have resulted from medical care in order to be protected from the consequences of the statute of limitations by seeking expert advice from the medical and legal communities. The fundamental objective of applying the discovery rule to the statute of limitations is to put malpractice plaintiffs on comparable footing as "other tort claimants" to be able to "determine within the period of limitations whether to sue or not." *Id.* at 124, 100 S. Ct. at 360, 62 L. Ed. 2d at 270. Thus, the discovery of relevant facts about the injury to commence the statute of limitations must include its cause in order to justify the commencement of the limitation period. The Iowa legislature could not have intended to commence the running of the statute of limitations through inquiry notice before inquiry is warranted.

We think it is clear our legislature intended the medical malpractice statute of limitations to commence upon actual or imputed knowledge of both the injury and its cause in fact. Moreover, it is equally clear this twin-faceted triggering event must at least be identified by

sufficient facts to put a reasonably diligent plaintiff on notice to investigate.

This approach rejects the claim made by the Rathjes that "the injury" that will trigger the statute can be separated into different degrees of harm or different categories of harm that separately give rise to different triggering dates. The statute does not work in that manner. We adhere to the rule that a plaintiff does not need to know the full extent of the injury before the statute of limitations begins to run. *See LeBeau*, 446 N.W.2d at 803 (holding statute of limitations begins to run even though the plaintiff is unaware of the full extent of his injury); *see also Murphy v. Aero-Med, Ltd.*, 345 F. Supp. 2d 40, 44 (D. Mass. 2004) (declaring plaintiff does not need to know the full extent of injury or need to identify the particular cause of the symptoms).

The statute begins to run only when the injured party's actual or imputed knowledge of the injury and its cause reasonably suggest an investigation is warranted. *See* Ralph V. Seep, Annotation, *Accrual of Cause of Action for Purpose of Statute of Limitations in Medical Malpractice Actions Under Federal Tort Claims Act—Post-Kubrick Cases*, 101 A.L.R. Fed. 27, 33 (1991) ("When the plaintiff has the knowledge of the "critical facts" concerning his or her injury and its cause, he or she is charged with the duty to investigate promptly and present any claim for relief."). The symptoms experienced by a patient can be sufficient to alert a reasonable person to the existence of the injury, but those symptoms may not always alert the plaintiff to the cause of the injury. These elements must be considered together to allow the statute of limitations to operate in its intended manner to protect unsuspecting plaintiffs.

The general approach we adopt today is consistent with the framework followed in other jurisdictions that apply the discovery rule to

statutes of limitation in medical malpractice cases. As previously indicated, nearly all jurisdictions in this country apply some form of the discovery rule to statutes of limitation in medical malpractice cases. David W. Feeder II, *When Your Doctor Says, "You Have Nothing to Worry About," Don't Be Sure: The Effect of* Fabio v. Bellomo *on Medical Malpractice Actions in Minnesota*, 78 Minn. L. Rev. 943, 953 (1994). While these jurisdictions reach different conclusions on the question whether discovery of causation involves the relationship between the injury and the factual cause or the relationship between the injury and negligence (or some evidence of wrongdoing), they all recognize causation to be an essential component of the analysis. *See Bussineau*, 518 A.2d at 430–35 (citing and reviewing cases from at least fifteen states that require either some evidence of wrongdoing to trigger the medical malpractice statute of limitations or require discovery of all elements of the cause of action); *Mastro*, 682 P.2d at 1167–68 (citing cases that have adopted the "legal injury" meaning of the word "injury" used in the statute of limitations governing medical malpractice actions); *Catz v. Rubenstein*, 513 A.2d 98, 102–03 (Conn. 1986) (same); *see also Booth*, 839 N.E.2d at 1172 (medical malpractice statute of limitations triggered when patient knows or should know of the malpractice and resulting injury); *Lagassey v. State*, 846 A.2d 831, 844 (Conn. 2004) (plaintiff must discover, from a factual standpoint, the nature and extent of the injury and that the injury was caused by the wrongful conduct of another); *Long v. Mem. Hosp.*, 969 So. 2d 35, 43 (Miss. 2007) (medical malpractice statute of limitations begins to run with knowledge of injury, cause of injury, and causal relationship between injury and conduct of physician); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997) (medical malpractice statute of limitations begins to run when plaintiff

discovers facts sufficient to give notice of an injury as a result of wrongful conduct). Although some courts appear to state a rule, from time to time, that the statute of limitations begins to run upon discovery of the injury alone, as we have done in the past, the validity of those holdings is suspect. Our review of all the authority from the other jurisdictions supports the approach we take today.

We emphasize the knowledge standard under the statute is predicated on actual or imputed knowledge of the facts to support the injury and of the facts to support a cause. *See Kubrick*, 444 U.S. at 124, 100 S. Ct. at 360, 62 L. Ed. 2d at 270 (holding statute of limitations begins to run from plaintiff's discovery of the relevant facts about the injury); *Maestas*, 152 P.3d at 147–48 (same). Importantly, we continue to adhere to the rule that the plaintiff does not need to discover that the doctor was negligent.

In applying the medical malpractice statute of limitations, as we now interpret it, to the undisputed facts in this case, it is clear the Rathjes knew Georgia was suffering from physical harm. However, a reasonable jury could find they did not know the cause of the harm until, at the earliest, April 27, 1999, the date the gastroenterologist made a diagnosis of "drug-induced hepatitis secondary to Antabuse." Moreover, the jury could find that, until that time, no facts were available that would have alerted a reasonably diligent person that the cause of the injury may have originated in Georgia's medical treatment so as to put the plaintiffs on notice of the need to investigate. Consequently, a reasonable jury could conclude the Rathjes filed their petition within the

two-year limitation of section 614.1(9). The district court erred in granting summary judgment for the defendants.[5]

The approach taken today departs from the direction we have taken in our prior cases since the time the statute was enacted. Yet, it is not necessarily inconsistent with the outcomes of our prior cases. Moreover, it better reflects the objective of the discovery rule to prevent the limitations period from commencing when blameless plaintiffs are unsuspecting of a possible claim.[6] We choose this approach because it is consistent with the language of the statute when placed in proper historical context, consistent with the purposes and goals of the statutory discovery rule, fair to patients, doctors and the medical malpractice insurance industry, respectful of the trust and confidence essential to a doctor-patient relationship, and best meets the overall goals of a justice system.

Finally, if our interpretation of the medical malpractice statute of limitations is out of line with the original intent of the legislature, that body can respond to correct it. We have tried to define the triggering date for the discovery rule with more clarity, and this will allow our legislature to intervene if we have missed the mark. Yet, we firmly believe this interpretation resolves the basic systemic problem that has plagued our prior interpretation of the statute and should allow the statute to work to better achieve its purposes and goals.

[5]The only issue presented to the district court was whether the defendants were entitled to summary judgment. The plaintiffs did not file a cross-motion for summary judgment. Thus, we are not presented with the question whether the Rathjes filed their petition within the two-year statute of limitations period as a matter of law.

[6]In all of our prior medical malpractice statute-of-limitations cases under section 614.1(9), the factual cause of the injury was known or should have been known at the time the injury was discovered. Thus, the absence of the factual-causation component adopted today from our prior analysis has not been responsible for any unfairness to a blameless, unsuspecting plaintiff. Any claims of past unfairness in the application of the discovery rule to the statute of limitations in medical malpractice cases must be analyzed under the injury component of the rule, a question not at issue in this case.

**IV. Conclusion.**

We reverse the decision of the district court and remand the case to the district court for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Wiggins, J., who concurs specially, and Streit, J., who takes no part.