FILED

07/21/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 11, 2022 Session

## TERESA FLETCHER KIDD, ET AL. v. BERNICE LEWIS

**Appeal from the Chancery Court for Washington County**
**No. 19-CV-0759      John C. Rambo, Chancellor**

_____

### No. E2021-01156-COA-R3-CV

_____

This appeal concerns an alleged conversion of funds. Rebecca Durbin, Teresa Fletcher Kidd, and Ramona Lewis ("Plaintiffs," collectively), the adult children of the late Charles Lewis ("Charlie"), sued Bernice Lewis ("Defendant"), Charlie's widow, in the Chancery Court for Washington County ("the Trial Court").[1] Plaintiffs alleged that Defendant exercised undue influence over Charlie in his later years and converted funds in a bank account that Charlie had intended for them to have. After a trial, the Trial Court ruled in favor of Plaintiffs. Defendant appeals, arguing among other things that the three-year statute of limitations applicable to Plaintiffs' claim had expired. Defendant also argues that the Trial Court erred by not awarding her any damages for Plaintiffs' failure to maintain Charlie's house, which Defendant continued to live in pursuant to Charlie's will. We hold that Plaintiffs were on constructive notice of their claim against Defendant no later than October 5, 2009, and thus their lawsuit filed in October 2019 is time-barred. We, therefore, reverse the judgment of the Trial Court with respect to Plaintiffs' claim against Defendant. However, we affirm the Trial Court as to its declination to award Defendant any damages for Plaintiffs' failure to maintain Charlie's house as Plaintiffs owed her no duty to maintain the house; per Charlie's will, that was his Estate's responsibility. We thus affirm, in part, and reverse, in part, the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

---

[1] Given the familial nature of this dispute, we sometimes use first names for ease of read. We also use first names when discussing individual Plaintiffs. We intend no disrespect in doing so.

Arthur M. Fowler and Arthur M. Fowler, III, Johnson City, Tennessee, for the appellant, Bernice Lewis.

David L. Robbins and Barbara A. Malone, Johnson City, Tennessee, for the appellees, Rebecca Durbin, Teresa Fletcher Kidd, and Ramona Lewis.

## OPINION

## Background

In February 2017, Charlie Lewis died. He had battled Alzheimer's Disease and dementia for a number of years. Defendant is Charlie's widow. Plaintiffs are Charlie's adult children from a prior marriage. Another key figure in the case is Charlie's brother and Plaintiffs' uncle, Don Lewis ("Don").

In October 2019, Plaintiffs, in their individual capacities, sued Defendant in the Trial Court. Plaintiffs alleged that Charlie intended for them to receive certain funds from the 2009 sale of the final remaining lot of Charlie's Old Lewis Supply property. Plaintiffs alleged that when Charlie died in February 2017, they discovered that those funds had been converted by Defendant. In July 2009, Charlie received the proceeds from the sale of his Old Lewis Supply property, funds which Don deposited into a Greenbank account in Charlie's and Defendant's names. On August 21, 2009, Don, using a "springing" power of attorney that Charlie had granted him in 2000,[2] opened a new account with Charlie named as the sole owner and Plaintiffs as the payable-on-death beneficiaries. Don transferred $300,000 from the Greenbank account in Charlie's and Defendant's names to this new account. After Charlie found out what Don had done, he revoked Don's power of attorney. Charlie then transferred the balance of the money back into an account in his and Defendant's names. Charlie used a portion of the money to purchase an annuity for $250,000, with Defendant listed as the sole beneficiary.

In response to Plaintiffs' complaint, Defendant filed an answer and counterclaim. Defendant asserted defenses such as the three-year statute of limitations applicable to Plaintiffs' conversion claim. In her counterclaim, Defendant alleged that Plaintiffs failed to reimburse her for expenses related to maintaining Charlie's house, which she was allowed to keep living in per Charlie's will. As relevant, Charlie's will provided: "My Estate shall be responsible for the payment of the taxes, repairs and insurance."

---

[2] The document provided that in the event Don failed to or ceased to serve in that capacity, Teresa would serve as Charlie's attorney-in-fact, subject to the incapacity requirements specified therein.

In April 2021, this matter was tried. We recount the pertinent testimony, beginning with that of Don. Don stated that he and Charlie were very close. He had assisted Charlie in business matters. Don testified that Defendant would "fuss" at Charlie and did not handle his having dementia well. In August 2009, in a bid to carry out what he understood to be Charlie's wish to look after Plaintiffs, Don used his power of attorney to transfer some $300,000 from one bank account to another, to be paid on Charlie's death to Plaintiffs. Don met with Carl McInturff, Charlie's lawyer. It was Don's understanding that he needed some additional proof of Charlie's incompetence. The power of attorney provided, in part: "The principal's disability or incapacity is proven and is conclusive on all persons by a writing signed by principal's usual attending physician signed no more than sixty (60) days prior to the use of this power." However, Don did not obtain such a writing. Don kept extensive notes from the time of the underlying events, which were entered into evidence at trial. Regarding the transaction at issue, Don testified:

Q. … You met with the plaintiff Teresa Kidd to make plans to move $300,000 to the money market account, didn't you?
A. Now, yes, I kept all the girls involved in what was going on. If you'll notice on that front page there where it had a bunch of social security numbers, I had to tell each one of them what I was doing and I had to get their social security numbers and date of birth and everything to put that in a money market.
Q. All right. And then on August the 21st you took the power of attorney you had and you went to the bank and you transferred the money using the power of attorney, correct?
A. The bank already had a copy of my power of attorney.

***

Q. You found a social worker, Pat Bolton. "She says I already have everything I need, but to get Charles's primary care doctor to sign Carl's document," Carl's letter, correct?
A. Yeah.
Q. Okay. And then she said I would need to go with Charlie to his doctor's appointment to get the letter signed.
A. That's what I just said, that I had to get an appointment and go with him to see the doctor.
Q. And you didn't do that.
A. No.
Q. Instead, down at the bottom of that, on August 25th you say, "Don't know what to do next. (nothing) (I guess just let it play out[)]." That's on Page 64 of your notes.

-3-

A. Yes.

Q. What do you mean -- what did you mean by "just let it play out," sir?

A. Well, I had done everything I could do that I could think of to get to Charlie's doctor to get a piece of paper or get it so I could -- the doctor to tell me what was wrong with Charlie.

Q. Okay.

A. And so I couldn't get to see the doctor, so I just had to forget it.

Q. Okay. All right. So you just let it play out.

A. I just let it; here we are today.

Q. All right. Now, during all this time in August while you're transferring that money, Charlie's here in Johnson City. He's in town, isn't he?

A. Oh, yeah.

Q. All right. And you never told Charlie what you were doing...

A. Oh, yes.

Q. ...until September -- no. Your notes said you told him what you did on September the 7th.

A. Well, me and Charlie had talked about all this beforehand.

\*\*\*

Q. All right, sir. Now, if you'll look on Page 72 of your notes, on October the 5th you went by -- have you found it? I don't want to go too fast for you. It's October 5, PM. Do you see that?

A. Yeah.

Q. Okay. So you went by the bank on October the 5th...

A. Yeah.

Q. ...and got a copy of Charlie's bank records.

A. "I went by the bank to check on Charlie's money market account. He has changed mailings to his house instead of mine. Banker wanted a registered copy of POA before they would give me a copy of his accounts." Okay. "Came home, got POA papers and went to the courthouse and had it registered, took it by the bank. Got a copy of accounts..."

Q. Of the accounts.

A. ..."they told me there is no way other than a court order that they can keep this money in bank without Charlie getting it out."

Teresa testified, as well. Teresa testified to an October 5, 2009 conversation she had with her father, as follows:

[O]n the 5th, I got a phone call from Dad. And he would call me sometimes, like, intermittently during the week, whatever. And so … I answered the

-4-

phone and, you know, he was doing small talk. And then, I mean, I heard Bernice in the -- in the background yelling at him to "Tell her. Tell her." And he said, "I took you and Don off." I was like, "What?"

I didn't know what he was talking about because I was so not expecting that. And so he said, "I took you all off." And I said, "Do you, you know, you mean the power of attorney?" And he said yes, and I was shocked and so we ended the conversation. And that was really the last kind of significant conversation I had with Dad for awhile and also certainly with Bernice because, once there was that conflict, then the communication broke down.

Teresa did not answer definitively when asked if she believed Charlie was competent in September or October of 2009. Teresa asserted that he was competent "[i]n some ways," but that she had "struggled" with the question of his competency. In addition, Dr. Thomas E. Schacht testified as an expert for Plaintiffs as to Charlie's declining condition in his later years.

Defendant also testified. At this juncture, counsel for Defendant moved for involuntary dismissal, which the Trial Court denied. Defendant then resumed her testimony. Defendant had entered into a prenuptial agreement with Charlie. She did not know what happened to the document, nor could she remember its terms. Charlie's will provided that Defendant could live in his home after his death. Everything else was left to Plaintiffs. During the marriage, Defendant worked at a group home for mentally-challenged people. Regarding Charlie's mental condition between July and November of 2009, Defendant stated that he "was functioning fairly well. He had some memory loss, but, at his age, you could expect that." Defendant stated that Charlie loved their trip together to Alaska that year. Defendant stated that in 2007, she and Charlie signed off on joint accounts for both of their checking accounts. When Defendant and Charlie returned from Alaska, Charlie discovered a transfer had been made out of their account. Defendant testified:

Q. And, if you look over at Page 856, does it, upper left-hand corner, does it show what happened to $300,000 of it?
A. It says "Transfer."
Q. And...
A. And it's got...
Q. 300,000. Who signed that?
A. Don Lewis, POA.
Q. Okay. So Don Lewis signed that for a POA. Tell me how you all discovered that and who discovered that, the discrepancy in the bank statement. Just explain to His Honor what happened.

-5-

A. Charlie usually always got the mail. So this day he got the mail and he come in and sat down at the bar, opened up his check, and he just had this expression. He said, "Where is my money?" And I said, "What money?" He said, "The money on the land." I said, "I don't know, you and Don was the one handling it; I didn't." But anyway he was very upset and angry and mad about that.

So he decided he would go to the bank. So we went over to the bank in Jonesborough and we spoke to a teller there. I don't think she was a teller; she was higher up. But anyway, he talked to her about his money. And he wanted to know where his money was. And she said that Don Lewis had come in and transferred the money from that account into another account. And he said, "What can I do about that?" And she said, "It's your money; you can do what you want to."

Q. And what did he do?
A. He transferred the money.
Q. Did he -- or did he just change the name on the account? Let me show you a document. If you would turn and look at Page 867, 867.
A. Yes.
Q. And is this the account Don transferred the money to?
A. 4685.
Q. That was the account he transferred the money to. And he transferred it from what account? Do you remember the number?
A. 2115, I think. I'm not sure.
Q. He transferred it from Account 1219?
A. 1219.
Q. And so this, this account that it was transferred to shows it's in the name of [Charlie] Lewis?
A. Yes.

***

Q. And tell me about that meeting and that -- and what happened at that meeting with Wesley Robbins [Greenbank financial advisor].
A. We went into his office and he -- he gave different options of what Charlie could do with his money. And Charlie seemed to be right on board. He talked to him. He was always, when it come to money, he was always right on top of it, seemed like. And so they figured out what he could do, so he made his investments. And, excuse me, Wesley asked him was he going to put my name on the account and I spoke up and said, "No. I don't want anybody to think I'm taking his money." So he said, "What do you want to do, Charlie?" And Charles says, "I want Bernice taken care of." And so

-6-

Wesley asked him, said, "Well, did you want to make her the beneficiary?"
And he said yes and that was all there was to it.
Q. Okay. And so Charlie signed the paperwork...
A. Right.
Q. ...and $250,000 of the money...
A. Yes.
Q. ...was put into an annuity.
A. Yes.
Q. And that money is still working in the annuity.
A. Right.
Q. Okay.
A. That's how we lived for several years and paid caregivers. And that's how I still live today, from that.

In September 2021, the Trial Court entered its final order, in which it ruled in favor of Plaintiffs. The Trial Court found, in relevant part:

2. Statute of Limitations

Plaintiffs' cause of action is best described as a claim of conversion of property. The applicable statute of limitations is found at Tennessee Code Annotated section 28-3-105, the three-year statute of limitations applicable to "[a]ctions for the detention or conversion of personal property." The period of limitations began to run "from the accruing of the cause of action." *See* Tenn. Code Ann. § 28-3-105. The cause of action accrued "when the plaintiff knew or reasonably should have known that a cause of action existed." *Stone v. Hinds*, 541 S.W.2d 598, 599 (Tenn. Ct. App. 1976).

The issue of accrual of a cause of action is basically a question of fact for the trier of fact. *National Mortg. Co. v. Washington*, 744 S.W.2d 574, 580 (Tenn. App. 1987). Defendant asserts Plaintiffs' cause of action accrued when the account was closed and converted to an annuity. All of this occurred in October 2009. In response, Plaintiffs alleged they were unaware of the account conversion until after their father's death on February 22, 2017.

\*\*\*

In July 2009, property associated with Charlie's company, Lewis Supply, was sold. The sale proceeds were deposited by Charlie's brother, Don Lewis (Don), on July 29, 2009, to a joint account owned by Charlie and Bernice.

From which, $69,612.22 was used to pay capital gains taxes, which left $336,220.24 in the account.

For many years, Don provided financial advice to Charlie. Don understood from Charlie that he wanted to leave some money for his daughters, so on August 21, 2009, Don used the power of attorney granted to him from Charlie to withdraw $300,000 from Charlie's account and open it into a new account with only Charlie as the owner with Plaintiffs as payment on death beneficiaries.

Before Don acted on August 21, 2009, to remove the disputed money from Charlie and Bernice's account, he met with Teresa on Aug. 20, to make plans with her to move the money. Then on Aug. 23, he told Teresa that he had completed the transaction. Thereafter on Aug. 24, Don met with attorney Carl McInturff, because he wanted a "document" to allow him to go to Mountain Home—Veterans Administration to talk to Charlie's doctors. On Sep. 7, Don told Charlie about the financial transactions concerning the disputed money.

Don's actions to move money occurred while Charlie and Defendant vacationed in Alaska. Upon his return, Charlie learned that his account balance was $35,492.71.

Charlie decided to close the account. He went to the bank and met with bank financial officer Wesley Robbins on October 1, 2009. After consulting with Mr. Robbins again on November 16, 2009, with Bernice present, Charlie purchased a $250,000 annuity, which funds are the subject of this lawsuit. He opened a new joint account with Defendant to purchase the annuity. Plaintiffs were not listed as beneficiaries of this new account. The interest from the annuity went to a joint checking account used by Charlie and Bernice.

An important date is October 5, 2009. Don approached bank personnel about keeping Charlie out of the account that he had established that made Charlie's daughters payment on death beneficiaries. Don called Teresa to tell her about this development. In light of all the circumstances, Teresa and her sisters were aware that Don lost control of this account, because Don knew that Charlie had changed the address of the account.

It was the information learned on October 5, 2009, which caused Teresa to hire an attorney on Oct. 7. However, the change of beneficiaries was beyond

that which was discoverable by Plaintiffs. Plaintiffs received their information regarding their father's finances from Don, and he no longer had the ability to access banking information regarding the account because of the POA revocation. Plaintiffs had no access to information regarding their father's finances. As a result, Plaintiffs discovered they were no longer beneficiaries of the long-closed account after their father died, and the evidence failed to establish they knew the account was closed, that annuities were purchased with funds from it, that Defendant was now a co-owner, and they were no longer payment on death beneficiaries.

For these reasons, there was no persuasive evidence the Plaintiffs knew of the account's conversion. It is not reasonable to expect Plaintiffs to have discovered the conversion until after their father's death. As their claims were filed within three years of his death, their claims were not time-barred by the applicable statute of limitations.

***

5. Defendant's Counterclaim

Defendant asserted a counterclaim for monetary damages for Plaintiffs' alleged failure to reimburse her for expenditures related to the expenses of taxes, repairs and insurance for Charlie's home that Charlie provided Bernice with the right to live, use and occupy. The evidence and testimony at trial failed to prove this claim. The counterclaim is dismissed.

6. Conclusion

Plaintiffs are awarded a judgment against Defendant for $250,000. Court costs are taxed to Defendant.

Defendant timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Defendant raises the following issues on appeal: 1) whether the Trial Court erred in finding that the applicable statute of limitations did not bar Plaintiffs' claim; 2) whether the Trial Court erred in finding that Defendant converted her own funds; and 3) whether the Trial Court erred in denying Defendant reimbursement of expenses related to Charlie's house.

-9-

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in finding that the applicable statute of limitations did not bar Plaintiffs' claim. The parties agree that the statute of limitations applicable to Plaintiffs' claim of conversion is three years. *See* Tenn. Code Ann. § 28-3-105. Defendant argues that any cause of action for conversion accrued on or before October 5, 2009. Plaintiffs did not file their lawsuit against Defendant until October of 2019. Thus, according to Defendant, Plaintiffs' lawsuit is time-barred. Defendant argues further that the statute of limitations was not tolled. According to Defendant, Plaintiffs "had facts sufficient to put a reasonable person on notice that they have suffered an injury as a result of wrongful conduct…." In response, Plaintiffs assert that, as found by the Trial Court, they did not discover the change in beneficiaries until after Charlie's death in February 2017; further, that the evidence failed to establish they knew the account was closed; that the annuities had been purchased with funds from the account; that Defendant was co-owner of the annuity; and that Plaintiffs no longer were payable-on-death beneficiaries.

In *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436 (Tenn. 2012), the Tennessee Supreme Court discussed when a cause of action accrues and when the statute of limitations begins to run, stating in part:

> Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995) (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994)). This latter circumstance is variously referred to as "constructive notice" or "inquiry notice." Quoting the Iowa Supreme Court, we have explained that inquiry notice "charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed.... [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate 'the injury,' the limitation period begins to run." *Sherrill v. Souder*, 325 S.W.3d [584] at 593 n. 7 [(Tenn. 2010)] (quoting *Rathje v. Mercy Hosp.*, 745 N.W.2d 443, 461 (Iowa 2008)); *see also Diamond v.*

*Davis*, 680 A.2d 364, 372 (D.C. 1996) (defining inquiry notice as the "notice which a plaintiff would have possessed after due investigation").

*Redwing*, 363 S.W.3d at 459 (footnotes omitted).

Don kept extensive notes, as the record reflects. Don's notes reveal that on October 5, 2009, he went to the bank and got "cop[ie]s of acc[oun]ts." One such account was a bank statement from September 29, 2009 showing that Plaintiffs' account had been changed from "Charles R Lewis, POD…" to "Charles R Lewis, Bernice S Lewis, POD…." On October 28, 2009, Don and Teresa consulted an attorney. When questioned at trial about moving $300,000 to the money market account, Don testified that he "kept all the girls involved in what was going on." Don thus had a document reflecting that Defendant had been named POD on the account; he kept Plaintiffs informed on his financial dealings for Charlie concerning them; and he and Teresa consulted a lawyer about the next steps to take. Despite these facts, Plaintiffs waited until October 2019 to sue Defendant.

The Trial Court found Don to be a "highly credible witness" who kept "helpful notes." A trial court's credibility determination is entitled to considerable deference, and it will not be overturned on appeal absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). We do not disturb the Trial Court's assessment of Don's credibility as we find no such clear and convincing evidence to the contrary in this record. Nevertheless, even crediting Don's testimony, the evidence preponderates against the Trial Court's finding that "the change of beneficiaries was beyond that which was discoverable by Plaintiffs." On October 5, 2009, the change of beneficiaries was, in fact, discoverable; Don had a document reflecting the change. While Don is not a party to the underlying lawsuit, Don and Plaintiffs coordinated closely on their activities regarding Charlie's money. As Don stated at trial, he "kept [Plaintiffs] involved in what was going on." Moreover, a lack of actual knowledge on Plaintiffs' part of the change in payable-on-death beneficiary is not dispositive. The salient point is that the change was discoverable by Plaintiffs upon due investigation. For example, while nothing in the record indicates that Plaintiffs simply asked their father about a change of beneficiaries, they certainly could have. Under the modern discovery rule as articulated by our Supreme Court in *Redwing*, Plaintiffs were on constructive notice of their claim by October 5, 2009.

The statute of limitations on Plaintiffs' conversion claim against Defendant began to run no later than October 5, 2009. It was incumbent upon Plaintiffs to act within the three-year limitations period if they wished to pursue their claim; respectfully, they were not entitled to "just let it play out." They consulted an attorney and still chose not to act within the limitations period. The limitations period expired after October 6, 2012. Plaintiffs filed their lawsuit in October of 2019, well beyond the expiration of the three-

year statute of limitations. Plaintiffs have not asserted a tolling theory that would have served to toll the statute of limitations. We, therefore, reverse the Trial Court on this issue and hold that Plaintiffs' conversion claim against Defendant is time-barred.[3]

The final issue we address is whether the Trial Court erred in denying Defendant reimbursement of expenses related to Charlie's house. Defendant sought $25,430.77 in such expenses. In their brief, Plaintiffs point out that Charlie's will provides that his Estate—which is insolvent—is responsible for maintaining the house, not them. Even still, Defendant cites as authority supporting her position the case of *Watson v. Payne*, 359 S.W.3d 166 (Tenn. Ct. App. 2011), a car accident case in which this Court found no material evidence to support the jury's award of zero damages. *Id*. at 170-71. *Watson* is inapposite. Plaintiffs owed no duty to Defendant to maintain Charlie's house. Under Charlie's will, maintenance of his house was the responsibility of his Estate, not Plaintiffs. This issue is without merit.

In sum, we affirm the Trial Court in its declination to award Defendant any damages for Plaintiffs' failure to maintain Charlie's house. However, we reverse the Trial Court with respect to the statute of limitations and hold that Plaintiffs' conversion claim against Defendant is time-barred as they were on constructive notice of their claim no later than October 5, 2009 and only filed suit in October 2019, well beyond the expiration of the applicable three-year statute of limitations.

### **Conclusion**

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellees, Rebecca Durbin, Teresa Fletcher Kidd, and Ramona Lewis.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[3] Given our holding as to this issue, Defendant's second issue of whether the Trial Court erred in finding that she converted her own funds is pretermitted. We do note that Defendant's uncontradicted testimony was that the annuity was "how [she and Charlie] lived for several years and paid caregivers." Given the evidence, Charlie benefitted at least to some extent, from this annuity.